830 F.2d 1441
 56 USLW 2228
 J. DOE, et al., Plaintiffs-Appellees,
v.
Linda REIVITZ and John F. Erickson, Defendants-Third-Party
Plaintiffs- Appellants,
v.
Otis BOWEN and Kay Willmoth, Third-Party Defendants.
J. DOE, et al., Plaintiffs-Appellees,
v.
Linda REIVITZ, individually and in her capacity as Secretary
of the Wisconsin Department of Health and Social Services
and John F. Erickson, individually and in his capacity as
Director of the Bureau of Economic Assistance of the
Wisconsin Department of Health and Social Services, and
their Agents, Employees, Successors in office, Assistants
and All Others Acting in Concert or Cooperation with them or
at their control, Defendants-Third-Party Plaintiffs- Appellees,
v.
Otis BOWEN, Secretary of the U.S. Department of Health and
Human Services and Kay Willmoth, Regional Administrator of
U.S. Department of Health and Human Services, Office of
Family Assistance, in Chicago, Illinois, Third-Party
Defendants-Appellants.
 Nos. 86-2350, 86-2561.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 2, 1987.
Decided Sept. 28, 1987.
As Amended March 22, 1988.*
 
 Deborah R. Kant, Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., for defendants-third-party plaintiffs-appellants.
 Patricia DeLessio, Legal Action of Wis. Inc., Milwaukee, Wis., for plaintiffs-appellees.
 Before WOOD and CUDAHY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 CUDAHY, Circuit Judge.
 
 
 1
 This case presents the question whether, consistent with the equal protection clause and the Social Security Act (the "SSA"), otherwise qualified citizen and alien children may be denied benefits under the Aid to Families with Dependent Children-Unemployed Parent ("AFDC-UP") program because their parents are illegal aliens. The district court struck down this restriction on both constitutional and statutory grounds. We affirm on the statutory basis and do not reach the constitutional issue.I.
 
 
 2
 The AFDC-UP assistance program is a branch of the more general Aid to Families with Dependent Children ("AFDC") program. AFDC is contained in Subchapter IV of the SSA. 42 U.S.C. Sec. 601 et seq. The AFDC program was established to provide funds to families headed by single parents to enable the parents to care for their children at home without having to go to work. 42 U.S.C. Sec. 601 (1982); Batterton v. Francis, 432 U.S. 416, 418, 97 S.Ct. 2399, 2402, 53 L.Ed.2d 448 (1977). Under AFDC, aid is furnished to families with dependent children; a "dependent child" is defined, in part, as one who has been deprived of parental support or care by reason of the death, continued absence or incapacity of a parent. 42 U.S.C. Sec. 606(a) (1982). In 1961, Congress established the AFDC-UP program, which expanded AFDC to encompass two-parent families in which the primary wage earner is unemployed. 42 U.S.C. Sec. 607 (1982). For purposes of AFDC-UP, a "dependent child" is defined to include a child deprived of parental support "by reason of the unemployment ... of the parent who is the principal earner...." 42 U.S.C. Sec. 607(a) (1982).
 
 
 3
 The AFDC and AFDC-UP programs are administered by the states, but the federal government provides a substantial portion of the funding on a matching basis. Once a state chooses to participate in AFDC and/or AFDC-UP, the state must conform its programs to the requirements provided in the statute and in the federal regulations promulgated by the Department of Health and Human Services ("HHS"). 42 U.S.C.A. Sec. 602(a) (West Supp.1987); King v. Smith, 392 U.S. 309, 316-17, 88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118 (1968). One condition of the AFDC and AFDC-UP programs is the work registration requirement. As a condition of receiving benefits, every individual, unless exempt,[1] must register for employment-related activities with a work incentive ("WIN") program. 42 U.S.C.A. Sec. 602(a)(19)(A) (West Supp.1987).[2] If a person who is required to participate in a WIN program refuses to do so without good cause, the needs of that particular individual are excluded in determining the amount of the family's AFDC grant. 42 U.S.C.A. Sec. 602(a)(19)(F) (West Supp.1987). If the individual who refuses to participate without good cause is the unemployed parent in a family receiving AFDC-UP benefits, aid is discontinued to the entire family. 42 U.S.C.A. Sec. 602(a)(19)(F)(ii) (West Supp.1987).[3]
 
 
 4
 In addition to the provisions dealing with mandatory employment activities, another statutory requirement relevant to the issue here centers on the immigration status of the AFDC recipient. Section 602(a)(33) provides that states, in calculating a family's need, can take into account only the needs of United States citizens, aliens admitted for permanent residency and other aliens present under color of law. 42 U.S.C.A. Sec. 602(a)(33) (West Supp.1987).[4]
 
 
 5
 Prior to April 1, 1985, the Wisconsin Department of Health and Social Services ("DHSS") provided AFDC-UP benefits to eligible citizen and alien children regardless of their parents' immigration status. If the unemployed parent was an illegal alien, Wisconsin would not take that parent's financial need into account in determining the amount of the family's grant; but the state's program did not provide for the disqualification of the entire family from the AFDC-UP program in this circumstance.
 
 
 6
 Wisconsin subsequently changed its policy in response to a federal audit and the receipt of a policy letter dated November 19, 1984 from Clyde Downing, a Regional Administrator of HHS (the "Downing letter"). This letter indicated that a state program must provide that the entire family is ineligible for AFDC-UP benefits if the family's primary wage earner is an illegal alien:
 
 
 7
 An illegal alien parent cannot satisfy all the requirements of a principal wage earner found in 45 CFR 233.100, specifically the criteria for 45 CFR 233.100(vi)(B)(5) [should be: 45 CFR 233.100(a)(5) ] with respect to WIN or public employment office registration due to his illegal status which bars him from employment in this country. Without such registration of a principal earner, there is no eligibility for AFDC-UP. Therefore, the illegal alien and his/her family case would be ineligible for AFDC-UP.
 
 
 8
 Downing letter at 1-2 (Short Appendix of Appellant HHS at 23-24). Pursuant to this federal policy, Wisconsin refused to allow illegal aliens to register with its WIN program and excluded the otherwise eligible children of the illegal aliens from the AFDC-UP program.
 
 
 9
 The plaintiffs filed suit in district court challenging Wisconsin's policy. The plaintiffs claimed that excluding the entire family from participating in AFDC-UP when the primary wage earner is an illegal alien violated the SSA and the equal protection clause of the Fourteenth Amendment. The suit proceeded as a class action in the district court; the plaintiff class consists of United States citizen children and eligible alien children who have been denied AFDC-UP benefits or whose benefits have been terminated solely on the basis of their parent/primary wage earner's status as an illegal alien. The complaint named as defendants various state employees, including the Secretary of the Wisconsin DHSS. The state defendants then filed a third-party complaint against the Secretary of HHS and the Regional Administrator of the Office of Family Assistance because the conduct challenged by the plaintiffs was dictated by federal policy.
 
 
 10
 Upon considering cross-motions for summary judgment, the district court ruled for the plaintiffs, finding that the challenged policy violated both the SSA and the equal protection clause. Doe v. Reivitz, No. 85-C-793, slip op. (E.D.Wis. July 22, 1986). With respect to the statutory argument, the district court concluded that Congress intended to provide AFDC-UP benefits to eligible citizen and alien children even if their parents were themselves ineligible for benefits because of the parents' status as illegal aliens. Id. at 10-12. In analyzing the equal protection challenge, the district court concluded that an intermediate level of scrutiny was appropriate because the challenged policy made classifications on the basis of alienage (i.e., the parent's alien status) which was beyond the power of the children to alter. Id. at 13-14. Applying the intermediate level of scrutiny, the district court found that none of the reasons proffered by the Secretary to justify the policy furthered a substantial federal goal. Id. at 14-19. Accordingly, the district court enjoined the defendants from denying or terminating AFDC-UP benefits solely because the primary wage earners in the plaintiffs' families were illegal aliens.
 
 
 11
 The defendants appeal. They contend that their interpretation comports with the SSA and the equal protection clause.
 
 II.
 
 12
 Because the SSA does not expressly address the issue before us, the question we must resolve is whether HHS' policy is consistent with the statutory language and congressional intent.[5] Before we begin our analysis of the statutory argument, it would be useful to emphasize exactly what intent HHS is asking us to ascribe to Congress. HHS frames its argument exclusively around the question whether Congress intended that an illegal alien should be allowed to participate in a WIN program. Despite this emphasis, however, we may not lose sight of the fact that the ultimate impact of the agency's policy is to deny, solely on the basis that their parents are illegal aliens, AFDC-UP benefits to children who are United States citizens and to alien children who reside lawfully in this country. To hold the agency's practice valid, we must therefore find that the impact on children comports with the language of the statute and with the intent of the legislature.[6]
 
 
 13
 In reviewing HHS' interpretation of the eligibility requirements under AFDC-UP, the first issue we must address is the degree of deference owed the agency's interpretation by a reviewing court. HHS argues that the very deferential standard of review enunciated by the Supreme Court in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), should apply in this case. In Chevron, the Court held that, unless Congress has clearly expressed its opinion on an issue of statutory interpretation, the only question remaining for a reviewing court is "whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. at 2782 (footnote omitted).
 
 
 14
 We do not agree with HHS that Chevron provides the appropriate standard of review in this case. In Chevron, the court was reviewing a regulation that was issued by the EPA through notice-and-comment rule making procedures pursuant to an implicit delegation of power by Congress. The regulation there is most appropriately characterized as a "legislative rule" because it was issued by an agency acting pursuant to a delegation of authority by Congress. Batterton, 432 U.S. at 425 n. 9, 97 S.Ct. at 2405 n. 9. A "legislative rule" that is "reasonably related to the purposes of the legislation, promulgated through proper procedures and not arbitrary or capricious" has the force of law and is controlling on the courts. Industrial Holographics, Inc. v. Donovan, 722 F.2d 1362, 1366 n. 6 (7th Cir.1983); see also Batterton, 432 U.S. at 425 n. 9, 97 S.Ct. at 2405 n. 9. The documents at issue in this case are interpretative rather than legislative in nature, and under longstanding principles, agency interpretations are not entitled to the same degree of deference commanded by the high-powered regulations reviewed in Chevron. See 2 K. Davis, Administrative Law Treatise Sec. 7:8 (1979). The Court in Chevron did not purport to alter the scope of review traditionally accorded interpretative documents. See American Federation of Labor v. Donovan, 757 F.2d 330, 340-41 & n. 7 (D.C.Cir.1985). There are good reasons why the HHS statements in question here should be viewed as interpretative and accorded less deference than force-of-law regulations.
 
 
 15
 The AFDC-UP eligibility requirement at issue here was first enunciated in a letter written by an HHS regional administrator to the Wisconsin DHSS, the Downing letter. Subsequent to the initiation of the present litigation in district court, the associate commissioner and the deputy associate commissioner of the Office of Family Assistance, the office within HHS responsible for administering AFDC, prepared a memorandum and declaration, respectively, in which they endorsed the policy expressed in the Downing letter; these documents were prepared specifically in response to this suit.[7] Although Congress has given the Secretary of HHS the power to define the term "unemployment" for purposes of AFDC-UP eligibility, 42 U.S.C. Sec. 607(a) (1982), Batterton, 432 U.S. at 425, 97 S.Ct. at 2405, neither the Downing letter nor the documents subsequently prepared by the Office of Family Assistance suggest that the policy in question was promulgated pursuant to the delegation of authority in section 607(a).
 
 
 16
 HHS' AFDC-UP eligibility policy is also more appropriately classified as interpretative in view of the informal and non-authoritative manner of its announcement. The deference due a substantive force-of-law rule is attributable in part to the way such rules are promulgated through notice-and-comment rule making pursuant to section 553 of the Administrative Procedure Act. 5 U.S.C. Sec. 553 (1982). See, e.g., United States v. Markgraf, 736 F.2d 1179, 1184 (7th Cir.1984) ("Deference is more appropriate where the agency has actively interpreted the statute through rule making.") (citation omitted), cert. dismissed, 469 U.S. 1199, 105 S.Ct. 1154, 84 L.Ed.2d 308 (1985); Production Tool Corp. v. Employment & Training Admin., 688 F.2d 1161, 1167 (7th Cir.1982). HHS did not engage in notice-and-comment rule making in issuing its AFDC-UP eligibility policy. The agency cannot now contend that courts must accord to this policy the deference due a legislative rule when the agency has not followed the normal procedures associated with force-of-law rule making.
 
 
 17
 Not only has the policy not been subject to notice and comment, but the Secretary's interpretation has also not been widely disseminated. At oral argument, the attorney for HHS stated that the Secretary's interpretation represents a policy uniformly applied across the country; however, the states apparently are not informed of this policy until the federal government discovers that a state is providing AFDC-UP benefits to families headed by unemployed illegal aliens. The agency has not pointed us to any policy statement that is accessible to all the state agencies charged with administering the AFDC-UP program, and HHS has not indicated whether it has had occasion to enforce this policy against any other state than Wisconsin. Indeed, Wisconsin may be the only state aware of HHS' policy on this issue.[8] For the foregoing reasons, the HHS policy should be subjected only to the scope of review appropriate to agency interpretations.
 
 
 18
 Agency interpretations, unlike legislative rules, are not controlling on the courts.
 
 
 19
 The courts may find [such documents] persuasive and may treat them as if they were binding, but the courts have the reserve of power to substitute their own judgment on all questions of statutory interpretation. The preliminary power of interpretation is in the agency, but the final power of interpretation is in the courts.
 
 
 20
 2 K. Davis, Administrative Law Treatise Sec. 7:11, at 55 (1979); see also Batterton, 432 U.S. at 425 n. 9, 97 S.Ct. at 2405 n. 9. Of course, the interpretation of a statutory term by an agency charged with administering the statute "do[es] constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). The weight given to an agency interpretation depends on many factors, including the validity of its reasoning, its consistency with earlier and later agency pronouncements and whether the administrative document was issued contemporaneously with the passage of the statute being interpreted. Morton v. Ruiz, 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); Skidmore, 323 U.S. at 140, 65 S.Ct. at 164; American Federation of Labor, 757 F.2d at 341.
 
 
 21
 The application of these factors here leads us to conclude that HHS' interpretation should not be accorded much weight. The agency's policy can in no way be characterized as a contemporaneous construction of the relevant statutory provisions. The AFDC-UP program has been in existence since 1961. The WIN program was enacted in 1967. In 1981, Congress amended section 602(a)(19)(F) by adding subsection (ii) which provides that the entire family is ineligible for AFDC-UP benefits if the parent/primary wage earner refuses to participate in WIN; in that same year, Congress enacted legislation rendering illegal aliens ineligible to receive benefits. The Downing letter was written in November 1984. HHS has not directed our attention to any earlier document embodying the policy it now presses on us.
 
 
 22
 As noted, HHS apparently has not attempted to impose its position uniformly on the states. And even during the course of this suit the rationale offered by HHS to justify its policy has shifted over time. The Downing letter rested on the proposition that illegal aliens cannot fulfill the WIN registration requirements because they cannot lawfully work in this country. In the district court, the agency abandoned its argument based on the inability of undocumented aliens to lawfully work here; HHS instead argued that only AFDC recipients can fulfill the WIN registration requirement and illegal aliens are excluded by statute from receiving AFDC. Memorandum of Defendant HHS in Support of Motion for Summary Judgment, at 8-12, Record No. 37, Doe v. Reivitz, No. 85-C-793 (E.D.Wis. July 22, 1986). The agency has combined these two arguments in its brief on appeal. We now turn to an examination of the validity of the agency's reasoning.
 
 
 23
 HHS' interpretation purports to be based on the language and structure of the statute establishing the AFDC and AFDC-UP programs as well as the policy that it believes animates AFDC-UP.[9] The government's statutory argument is constructed through a chain of reasoning premised on section 602(a)(33).[10] HHS contends that to be eligible to register with a WIN program, one must oneself be eligible for AFDC benefits. Because section 602(a)(33) disqualifies illegal aliens from eligibility for AFDC benefits, HHS reasons that they are also ineligible to register with WIN. Thus, in a family in which the primary wage earner is an illegal alien, the entire family would be ineligible to receive AFDC-UP benefits because the unemployed parent cannot satisfy the requirement that he or she be registered with a WIN program. 42 U.S.C. Sec. 607(b)(2)(C)(i) (1982), 42 U.S.C.A. Sec. 602(a)(19)(F)(ii) (West Supp.1987).
 
 
 24
 Two of HHS' premises, however, do not represent reasonable interpretations of the statutory language and legislative history of the AFDC and AFDC-UP programs. The first argument with which we take issue is HHS' claim that an individual must himself be eligible for AFDC benefits to participate in a WIN program. The statute itself does not impose such a condition of eligibility; HHS attempts to draw such an inference from various statutory provisions and statements in the legislative history. The evidence HHS points to in support of its position, however, is not persuasive.
 
 
 25
 HHS' statutory argument relies in part on sections 645(b)(1)(B), 632a(b) and 614, which enable states to establish work incentive demonstration projects and job training and employment programs that are more specialized than the general WIN program. 42 U.S.C. Secs. 645(b)(1)(B), 632a(b), 614 (1982).[11] Congress requires AFDC eligibility as a condition of qualifying for participation in demonstration projects and work supplementation programs established under these sections. HHS argues from this fact that Congress intended that this condition of eligibility apply to the more general WIN program.
 
 
 26
 Rather than supporting HHS' interpretation, sections 645(b)(1)(B), 632a(b) and 614(c)(2) cut against it. These provisions show that when Congress wished to make AFDC eligibility a prerequisite for another program, the legislature clearly expressed this intent in the statutory language. As noted, Congress has not expressed such an intent with respect to eligibility for registration with a WIN program.[12]
 
 
 27
 HHS' position is also internally inconsistent. On the one hand, the government argues that one must be eligible for AFDC benefits oneself before one can register with WIN and that because illegal aliens are disqualified by section 602(a)(33) from receiving AFDC benefits, they cannot register with WIN programs. The government, however, takes a different position with respect to aliens who attain lawful temporary residence status under the recent immigration law. Immigration Reform and Control Act of 1986 ("IRCA"), Pub.L. No. 99-603, 100 Stat. 3359 (1986). IRCA provides for the legalization of aliens who meet the requirements specified under the Act. See 8 U.S.C.A. Sec. 1255a(a) (West Supp.1987). Aliens who are granted temporary resident status under IRCA are disqualified by statute from receiving AFDC benefits for a period of five years following the date they obtained temporary resident status. 42 U.S.C.A. Sec. 602(f) (West Supp.1987); 8 U.S.C.A. Secs. 1160(f), 1161(d)(6), 1255a(h) (West Supp.1987). HHS stated in its brief and at oral argument that it would permit these newly legalized aliens to register immediately for WIN. Reply Brief of Appellant HHS at 6. This position contradicts HHS' argument that only those persons who are themselves eligible for AFDC benefits can participate in a WIN program.
 
 
 28
 We also disagree with HHS' conclusion that an illegal alien's immigration status renders him or her ineligible to register with a WIN program, thereby disqualifying the alien's family, including the alien's otherwise eligible citizen and alien children, from receiving AFDC-UP benefits. 42 U.S.C. Secs. 607(b)(2)(C)(i), 602(a)(19)(F)(ii). According to HHS, this interpretation of the AFDC-UP program best comports with the goal of AFDC-UP and also fosters the policies of the IRCA. The first point HHS makes is that allowing aliens to participate in WIN would not further what the agency sees as the central purpose of the AFDC-UP program, the eventual employment of the parent, because the parent cannot be legally employed. Second, because such persons cannot lawfully work in this country, illegal aliens should not be permitted to register with WIN programs because the federal government and the states should not expend funds to aid illegal aliens to re-enter the work force. HHS' final point is that permitting illegal aliens to participate in WIN would subvert the IRCA, which makes it illegal to employ such persons.
 
 
 29
 We agree with HHS' position that job training and the eventual employment of the parent is an important goal of the AFDC-UP program.[13] However, HHS, in seeking to justify its policy, has almost completely ignored the overriding goal of AFDC-UP which is "to aid the family of the involuntarily unemployed." Batterton, 432 U.S. at 429, 97 S.Ct. at 2407 (emphasis added).[14] Applying sections 602(a)(19)(F)(ii) and 607(b)(2)(C)(i) to disqualify otherwise eligible citizen and alien members of an illegal alien's family completely subverts the purpose behind these provisions. These sanctions are aimed at entirely different targets: parents who can work but who refuse training and/or offers of employment. The disqualification of an unemployed wage earner's entire family from AFDC-UP if he or she refuses to register with WIN serves as an incentive to such individuals to engage in a job search. This carrot-and-stick rationale does not justify rendering the family of an illegal alien ineligible for AFDC-UP. A parent who is ineligible to become legalized can do nothing to change his or her status.[15] Further, although a parent who is an illegal alien cannot be lawfully employed, he or she can still be considered "involuntarily unemployed."
 
 
 30
 HHS' position also may lead to anomalous results within a state insofar as it is premised on the idea that illegal aliens cannot register with WIN. The AFDC statute does not require that WIN programs be established in every county. Wisconsin operates a WIN program in only approximately one-third of the state's 72 counties. If an unemployed parent is precluded from effectively participating in a WIN program because he or she lives too far from a program, the parent must register with the state public employment office to be eligible for AFDC-UP. 42 U.S.C. Sec. 607(b)(2)(C)(i) (1982). The Downing letter did not purport to define the eligibility of illegal aliens to register with state employment programs. On December 13, 1985, over a year after the Downing letter, the Wisconsin job service office issued a directive to its employees instructing them not to inquire into the immigration status of applicants. Record No. 34, Ex. 4. Thus, illegal aliens who live in non-WIN counties could satisfy AFDC-UP's employment registration requirement and qualify their families for benefits. When this anomaly was brought to the attention of the government's attorney during oral argument, she indicated without explanation that illegal aliens would not benefit by living in non-WIN counties.
 
 
 31
 Another concern expressed by HHS is that, if illegal aliens are permitted to register with WIN programs, the federal and state governments will be undermining the provision in IRCA that makes it unlawful to employ illegal aliens.[16] It is unclear to us, however, why the only two options seen by HHS are either allowing illegal aliens to register with WIN and providing them with job training and placement or prohibiting them from even registering with such programs. Allowing illegal aliens to register with WIN need not necessarily lead to public funds being expended to find employment for them. After an illegal alien registers with a WIN program,[17] we see no reason why the government cannot at that point simply refuse to aid in the employment of the alien.[18]
 
 
 32
 In framing its arguments in this case, HHS keeps coming back to the idea that its interpretation is more in line with Congress' intent because a survey of "public welfare assistance programs demonstrates plainly that illegal aliens or aliens who have no legitimate right to reside here are generally not considered eligible for public assistance." Brief of Appellant HHS at 27 n. 15. HHS is surely right on this point. Congress has in fact specifically provided within the AFDC program that illegal aliens are not themselves eligible to receive benefits. 42 U.S.C.A. Sec. 602(a)(33) (West Supp.1987). The issue here, however, is whether benefits will be provided to children who are United States citizens or who are aliens eligible to reside here. The illegal alien parents of these children are not seeking benefits for themselves. We do not think that the intent to exclude citizen and eligible alien children from the AFDC-UP program should be lightly imputed to Congress, and the arguments offered by HHS fall far short of establishing that its policy is consistent with Congress' intent.
 
 III.
 
 33
 One further issue deserves this court's attention. HHS has stated that it will permit the otherwise eligible children of aliens naturalized under IRCA to receive AFDC-UP benefits. In light of this policy, the plaintiffs suggested that we remand this case to enable the district court to consider the effect of IRCA on the representativeness of the named class members under Rule 23(a)(3) of the Federal Rules of Civil Procedure and IRCA's effect on the definition of the class. We decline to remand the case on either basis.
 
 
 34
 We do not think that it is necessary to remand to allow the district court the opportunity to determine whether to substitute. It is true that the current named parties might be eligible to be legalized under IRCA, thereby qualifying their children for AFDC-UP benefits. However, illegal aliens could not apply for temporary resident status under IRCA until May 5, 1987, which was subsequent to oral argument in this case. Thus, at the time this appeal was prosecuted, insofar as we are aware, all the named plaintiffs were still illegal aliens and their children were still being denied benefits on that basis. Substitution of named parties might be necessary in the future to assure representativeness if additional proceedings take place in this case; however, it is not necessary for purposes of this appeal.
 
 
 35
 Remand is also not necessary to redefine the class. The class as certified by the district court is composed of
 
 
 36
 All needy United States citizen and eligible alien children who are applying for or have been receiving AFDC-UP benefits and whose benefits have been, are being, or will be denied or terminated because of defendants' policy that AFDC-UP benefits may not be paid if the principal wage earner in the household is an undocumented or illegal alien for AFDC purposes.
 
 
 37
 Doe v. Reivitz, No. 85-C-793, slip op. at 19 (E.D.Wis. July 22, 1986). We agree with HHS' position that remand is not necessary because the class as defined does not apply to aliens legalized under IRCA and their children. The class includes only those children who have been denied benefits because "the principal wage earner in the household is an undocumented or illegal alien...." The children of aliens who obtain lawful resident status under IRCA do not fit within this class. Thus, a remand to redefine the class to exclude such children would be pointless because the existing class definition does not encompass such individuals.
 
 
 38
 AFFIRMED.
 
 
 39
 HARLINGTON WOOD, JR., Circuit Judge, dissenting.
 
 
 40
 I must respectfully dissent from the majority's opinion which is understandably concerned with the impact of this legislation on the innocent children of illegal aliens. If, however, this statutory scheme as it has been congressionally constructed is perceived by the majority to be misguided then the arguments should be addressed to the Congress. We should not amend the acts by persuading ourselves that we know better than does the Congress what should be done about the children.
 
 
 41
 The statutory scheme we seek to interpret is not complex and clearly evidences understandable and legitimate purposes. It is designed to discourage illegal aliens coming here whether it be to seek employment or for some other reason. It is an attempt to reserve job training and jobs for our own citizens, lawful permanent residents, and color-of-law aliens. Those properly employed here would otherwise be required to support the families of unemployable illegal aliens. There is, on the other hand, an obvious effort to reduce welfare dependency by motivating all wage earners entitled and able to work to support their own families. We need only to examine the broad outlines of the implicated programs and legislation to discern their meaning and purposes.
 
 
 42
 The Aid to Families with Dependent Children (AFDC) program was authorized under the Social Security Act[1] in a cooperative effort with the states to provide financial assistance to certain needy families with dependent children, and to encourage the older members of the family to support themselves and their children. AFDC recipients are required to register in the work incentive program which encompasses training, employment and other employment-related activities.[2] For a child to be considered dependent and eligible, the child ordinarily must have been deprived of a parent either by death, continued absence or mental incapacity.[3] In 1981 Congress added a provision that removed any doubt about the eligibility of illegal aliens under the act by restricting these welfare provisions for the benefit of citizens and aliens lawfully residing here.[4] Illegal aliens are not eligible.
 
 
 43
 Another related program was temporarily initiated by Congress in 1961 labeled the Unemployed Parents Program (AFDC-UP).[5] This relaxed the eligibility requirement that a dependent child must have suffered the loss of one parent, and made eligible those children who live with both parents provided the principal wage earner is unemployed. This program emphasized the use of state job placement services. In 1967 Congress made this AFDC-UP program permanent and added WIN, a work incentive program. WIN required registration and participation by all AFDC recipients. In 1981 Congress, perceiving the necessity to apply more work pressure, provided that the entire family be disqualified for AFDC-UP benefits if the family principal wage earner did not register under WIN for work training and placement. The principal family wage earner among other things cannot refuse a bona fide offer of employment.[6]
 
 
 44
 There is a significant difference between the AFDC program and the AFDC-UP program. Under AFDC if the wage earner does not participate in WIN his welfare share is deducted, but the family continues to receive its share. However, under AFDC-UP if the wage earner does not register and participate in WIN the entire family becomes ineligible for benefits.[7] Registration for WIN is a major prerequisite for benefits, but a person cannot register for WIN unless that person qualifies for AFDC. Since illegal aliens are not eligible for AFDC and thus cannot participate in WIN, the illegal alien and his entire family are excluded from the AFDC-UP program. The illegal alien's family is treated the same as a citizen's family should the citizen wage earner prefer to avoid WIN and labor for any reason, as some do.
 
 
 45
 A review of those welfare programs seems clearly to leave illegal aliens on their own. However, if there be any doubt, Congress passed the Immigration Reform and Control Act of 1986 (IRCA) which made it illegal, among other things, to knowingly hire illegal aliens.[8] Included was a requirement that federal-state public assistance programs, including AFDC, must condition eligibility on citizenship verification or lawful immigration status. Civil penalties and other remedies are authorized for employers who violate the illegal alien hiring prohibition.
 
 
 46
 This mere brief review of the pertinent legislation and its plain meaning requires nothing more to justify the Secretary's enforcement policies. I see no need to belabor it further unless we are to abandon the long-established customary standards for statutory construction. "If the plain language of the statute is clear, we do not look beyond those words to interpret the statute." Kelly v. Wauconda Park District, 801 F.2d 269, 270 (7th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1592, 94 L.Ed.2d 781 (1987). "It is well established that the plain language of a statute is important, and often the best, evidence of its meaning." Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."). It is not for us to search for a result we may perceive as judges to be more desirable than what Congress provided, even when children are involved. The oral arguments we hear in court are not equivalent to congressional hearings when Congress is considering legislation.
 
 
 47
 Justice Stevens writing for a unanimous court in Mathews v. Diaz, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), a case in which aliens challenged certain eligibility requirements for participation in a federal medicare insurance program, noted that even if the requirements to which the aliens objected were eliminated, "surely Congress would at least require that the alien's entry be lawful." Id. at 82, 96 S.Ct. at 1893. The Supreme Court recognized the broad powers of Congress over naturalization and immigration. This present case is concerned with that power which permits Congress to make rules which perhaps would be unacceptable if applied to our own citizens. Id. at 80, 96 S.Ct. at 1891.
 
 
 48
 The majority does not reach the constitutional issue as it resolves the case by statutory interpretation. Nor do I see the need to reach the constitutional issue as I also believe the question in this case should and can be resolved merely by reading the statutes. If we were to reach the constitutional issue, however, Justice Stevens in Mathews has already settled that issue for us: "Neither the overnight visitor, the unfriendly agent of a hostile foreign power, the resident diplomat, nor the illegal entrant, can advance even a colorable constitutional claim to a share in the bounty that a conscientious sovereign makes available to its own citizens and some of its guests." Id. at 80 (emphasis in original).
 
 
 49
 Congress may provide federal aid for the needy children of unemployed illegal aliens if it desires, and that may be a worthy humanitarian goal, but it has not done so with this legislation. I would reverse the judgment of the district court.
 
 
 
 *
 The Order amending this opinion is published at 842 F.2d 194
 
 
 [1]
 Those persons exempt from registration are listed in subsection 602(a)(19)(A). Under this provision, a state plan must:
 (19) provide--
 (A) that every individual, as a condition of eligibility for aid under this part, shall register for manpower services, training, employment, and other employment-related activities (including employment search, not to exceed eight weeks in total in each year) with the Secretary of Labor as provided by regulations issued by him, unless such individual is--
 (i) a child who is under age 16 or attending, full-time, an elementary, secondary, or vocational (or technical) school;
 (ii) a person who is ill, incapacitated, or of advanced age;
 (iii) a person so remote from a work incentive project that his effective participation is precluded;
 (iv) a person whose presence in the home is required because of illness or incapacity of another member of the household;
 (v) the parent or other relative of a child under the age of six who is personally providing care for the child with only very brief and infrequent absences from the child;
 (vi) the parent or other caretaker of a child who is deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, if another adult relative is in the home and not excluded by clause (i), (ii), (iii), or (iv) of this subparagraph (unless he has failed to register as required by this subparagraph, or has been found by the Secretary of Labor to have refused without good cause to participate under a work incentive program or accept employment as described in subparagraph (F) of this paragraph);
 (vii) a person who is working not less than 30 hours per week;
 (viii) the parent of a child who is deprived of parental support or care by reason of the unemployment of a parent, if the other parent (who is the principal earner, as defined in section 607(d) of this title) is not excluded by the preceding clauses of this subparagraph; or
 (ix) a woman who is pregnant if it has been medically verified that the child is expected to be born in the month in which such registration would otherwise be required or within the 3-month period immediately following such month.
 ....
 42 U.S.C.A. Sec. 602(a)(19)(A) (West Supp.1987).
 
 
 [2]
 WIN programs were established by Congress:
 for the purpose of restoring members of AFDC families (including those with little or no work experience) to regular employment through counseling, placement services and training, and arranging for all others to get paid employment in special work projects to improve the communities in which they live[.]
 S.Rep. No. 744, 90th Cong., 1st Sess., reprinted in 1967 U.S.Code Cong. & Admin.News 2834, 2982.
 
 
 [3]
 For purposes of AFDC-UP, if the parent who is the primary wage earner is exempt from registering with a WIN program because he or she lives too far from such a program, 42 U.S.C.A. Sec. 602(a)(19)(A)(iii) (West Supp.1987), that parent is required to register with the state public employment office. 42 U.S.C. Sec. 607(b)(2)(C)(i) (1982)
 
 
 [4]
 Section 602(a)(33) requires state programs to
 (33) provide that in order for any individual to be considered a dependent child, a caretaker relative whose needs are to be taken into account in making the determination under paragraph (7), or any other person whose needs should be taken into account in making such a determination with respect to the child or relative, such individual must be either (A) a citizen, or (B) an alien lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law (including any alien who is lawfully present in the United States as a result of the application of the provisions of section 1157(c) of Title 8 (or of section 1153(a)(7) of Title 8 prior to April 1, 1980), or as a result of the application of the provisions of section 1158 or 1182(d)(5) of Title 8);
 42 U.S.C.A. Sec. 602(a)(33) (West Supp.1987).
 
 
 [5]
 Although the defendants in this case include state as well as federal officials, this opinion will refer only to HHS in discussing the defendants' arguments. The state and federal defendants relied upon essentially the same arguments in their briefs
 
 
 [6]
 The dissent contends that the statutory scheme establishing the AFDC and AFDC-UP programs clearly reveals Congress' intent on this issue and that the legislature obviously wished to deny benefits to families headed by illegal aliens. As the succeeding pages demonstrate, however, neither the statute nor the legislative history suggests that Congress even considered the question presented by this case, and HHS' attempt to ascribe to Congress an intent to deny benefits does not withstand scrutiny
 
 
 [7]
 The documents prepared by the Office of Family Assistance were not submitted to the district court; the government claims that this was merely an oversight on its part. Reply Brief of Appellant HHS at 9 n. 5
 
 
 [8]
 Apparently, no other court has considered the validity of HHS' policy. A Washington state trial court struck down an identical policy adopted by the state agency charged with the administration of the AFDC program. The court invalidated the policy on the ground that it conflicted with the SSA. Garcia v. Rahm, No. 84-2-01010-7 (July 8, 1985) (unpublished opinion). The Washington State Department of Social and Health Services apparently was not then aware that its policy was sanctioned by HHS else it undoubtedly would have brought the federal policy to the attention of the court. The state defendant has not appealed the decision in Garcia
 
 
 [9]
 The dissent adopts HHS' statutory argument without elaboration. Infra, at 1452
 
 
 [10]
 The text of 42 U.S.C.A. Sec. 602(a)(33) (West Supp.1987) is reproduced supra at 1444 n. 4
 
 
 [11]
 Under section 645, a state is authorized to establish a work incentive demonstration project as an alternative to the WIN program. The statute specifically provides that persons eligible for AFDC are eligible to participate in demonstration projects. 42 U.S.C. Sec. 645(b)(1)(B) (1982)
 Section 632a enables HHS to enter into agreements with the states for the purpose of conducting demonstration projects "for the training and employment of eligible participants as homemakers or home health aides." 42 U.S.C. Sec. 632a(a) (1982). In order to be considered an "eligible participant" under the statute, an individual must be eligible for financial assistance under AFDC and must have been receiving such assistance for the ninety-day period before he or she entered the demonstration project. 42 U.S.C. Sec. 632a(b) (1982).
 Under section 614, a state is permitted to establish a work supplementation program under which the state makes jobs available as an alternative to providing aid. To be eligible to participate in a work supplementation program, the statute requires that an individual be eligible for AFDC. 42 U.S.C. Sec. 614(c)(2) (1982); see also S.Rep. No. 97-139, 97th Cong., 1st Sess., reprinted in 1981 U.S.Code Cong. & Admin.News 396, 777.
 After we issued our opinion in this case, we received a letter from plaintiffs' counsel suggesting that some of the above-cited sections apply to the Wisconsin program since that program is not entirely a general WIN program. Neither the state nor the federal government, however, filed a petition for rehearing, and this portion of our statutory analysis remains applicable to the extent the program is a general WIN program. Further, nothing in the letter casts any doubt on the remainder of our analysis or on the result.
 After we issued our opinion in this case, we received a letter from plaintiffs' counsel suggesting that some of the above-cited sections apply to the Wisconsin program since that program is not entirely a general WIN program. Neither the state nor the federal government, however, filed a petition for rehearing, and this portion of our statutory analysis remains applicable to the extent the program is a general WIN program. Further, nothing in the letter casts any doubt on the remainder of our analysis or on the result.
 
 
 [12]
 The remaining sections of the AFDC program and portions of its legislative history cited by HHS are not very helpful in resolving the question before us. See, e.g., 42 U.S.C. Secs. 630, 631(c)(1), 632(a) & 632(e) (1982); S.Rep. No. 744, 90th Cong., 1st Sess., reprinted in 1967 U.S.Code Cong. & Admin.News 2834, 3120-21. For example, section 630 states that the purpose of WIN programs is to require states to establish programs "under which individuals receiving aid to families with dependent children will be furnished incentives, opportunities, and necessary services" for their training and employment. This section, however, simply defines the general goals of WIN programs and in no way purports to define the eligibility requirements for participants
 
 
 [13]
 See, e.g., 42 U.S.C. Secs. 607(b)(2)(C)(i), 602(a)(19)(F)(ii) (disqualifies entire family from receiving AFDC-UP benefits if unemployed parent is not participating or refuses to participate in WIN); 42 U.S.C. Secs. 607(b)(1), 607(b)(2)(C)(ii) (if principal wage earner has refused a bona fide offer of employment or job training or unemployment compensation, entire family must be denied benefits)
 
 
 [14]
 In describing the bill on the floor of the House, a cosponsor stated that the concern was with the "involuntarily unemployed and I put the emphasis on the word 'involuntarily.' " 107 Cong.Rec. 3767 (1961) (remarks of Cong. Byrnes)
 Batterton, 432 U.S. at 429 n. 14, 97 S.Ct. at 2407 n. 14. See also 42 U.S.C.A. Sec. 602(a)(19)(F)(ii) (West Supp.1987) ("if the parent who has been designated as the principal earner, for purposes of section 607 of this title, makes such refusal [i.e., to participate in WIN or to accept employment], aid will be denied to all members of the family") (emphasis added).
 HHS' position that participation in job training or in an employment search program is an absolute prerequisite to receiving benefits under AFDC-UP is contradicted by 42 U.S.C. Sec. 607(b)(2)(C)(i) (1982). This section provides that if a primary wage earner is exempt from registering with a WIN program under 42 U.S.C. Sec. 602(a)(19)(A), his or her family can still receive AFDC-UP benefits.
 
 
 [15]
 Thus, contrary to the dissent's characterization, an illegal alien is not in the same position as any other worker who prefers "to avoid WIN and labor." Infra at 1452. The word "avoid" erroneously suggests that an illegal alien's inability to be lawfully employed in this country is the result of a voluntary choice
 
 
 [16]
 After the district court issued its decision in this case, Congress passed the IRCA. One of IRCA's provisions makes it unlawful to employ illegal aliens; prior to IRCA, no law provided sanctions for the employers of such aliens, Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 892-93, 104 S.Ct. 2803, 2808-09, 81 L.Ed.2d 732 (1984). HHS made this provision of IRCA one of the centerpieces of its argument; the dissent relies on this provision as well. In reality, however, IRCA simply adds additional sanctions for conduct that was effectively already illegal. Prior to IRCA, an alien working without proper authorization from the United States government could be deported. 8 U.S.C. Sec. 1251 (1982). In addition to the existing threat of deportation, IRCA provides that an employer can face sanctions for employing an illegal alien
 Another of IRCA's provisions, on which HHS and the dissent rely, requires individuals, as a condition of eligibility for assistance under programs such as AFDC, to verify their citizenship or lawful immigration status. 42 U.S.C.A. Sec. 1320b-7(d) (effective Oct. 1, 1988) (West Supp.1987). This provision, however, simply provides a mechanism to enforce an existing eligibility requirement. See 42 U.S.C.A. Sec. 602(a)(33) (West Supp.1987). Section 602(a)(33) disqualifies only ineligible aliens for AFDC benefits; as already noted, the illegal alien parents in this case do not seek benefits for themselves.
 
 
 [17]
 In a holding not contested by appellees on appeal, the district court found that illegal aliens are not exempt from registering with WIN programs
 
 
 [18]
 WIN registrants are not automatically referred to job training and placement services. See S.Rep. No. 97-139, 97th Cong., 1st Sess. 507, reprinted in 1981 U.S.Code Cong. & Admin.News 396, 773
 
 
 [1]
 42 U.S.C. Sec. 601 et seq
 
 
 [2]
 42 U.S.C. Sec. 602(a)(19)(A). There are certain exemptions which are not pertinent to this case
 
 
 [3]
 42 U.S.C. Sec. 606(a)(1)
 
 
 [4]
 42 U.S.C. Sec. 602(a)(33)
 
 
 [5]
 42 U.S.C. Sec. 607
 
 
 [6]
 42 U.S.C. Sec. 607(b)(1). The principal wage earner also must not refuse unemployment compensation or be unemployed because of a labor dispute or strike. 42 U.S.C. Sec. 607(b)(2)(C)(ii); 45 C.F.R. Sec. 233.106 (1986)
 
 
 [7]
 42 U.S.C. Sec. 602(a)(19)(F); 42 U.S.C. Sec. 607(b)(2)(C)(i)
 
 
 [8]
 See IRCA, Pub.L. No. 99-603, Sec. 101(a)(1), 100 Stat. 3341-3 to -36