Christian **HANSON** and Evan Hanson, general partners of and doing business as Hanson Farms, Plaintiffs–Appellees,

v.

Michael **ESPY**,* Secretary, United States Department of Agriculture, Defendant–Appellant.

No. 92–1918.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 5, 1992.

Decided Oct. 22, 1993.

---

* During the pendency of this case, The Honorable Michael Espy succeeded The Honorable Edward Madigan as Secretary of Agriculture. Secretary Espy has been substituted for his predecessor pursuant to Federal Rule of Appellate Procedure 43(c)(1).

Sydney Berde (argued), Doherty, Rumble & Butler, St. Paul, MN, for plaintiffs-appellees.

Richard A. Olderman, Robert S. Greenspan, Dept. of Justice, Civ. Div., Appellate Section; Raymond Fullerton, Dept. of Agriculture, Office of the Gen. Counsel, Washington, DC, Christa A. Reisterer, Asst. U.S. Atty., Office of the U.S. Atty., Madison, WI, and Leslie K. Lagomarcino (argued), Dept. of

Agriculture, Washington, DC, for defendant-appellant.

Before RIPPLE and KANNE, Circuit Judges, and WILLIAMS, District Judge.[**]

RIPPLE, Circuit Judge.

This is an appeal by the Secretary of Agriculture ("the Secretary") from a summary judgment order entered in favor of the plaintiffs. The Secretary seeks to deny the plaintiffs disaster benefits under the Disaster Assistance Act of 1988 ("the Act"). 7 U.S.C. § 1421 note, §§ 201–41 (1988). The Secretary deemed the plaintiffs ineligible for disaster benefits because he found them to be persons whose qualifying gross revenues exceeded $2 million annually. In granting summary judgment in the plaintiffs' favor, the district court determined that the Secretary had based his decision on an inaccurate interpretation of the Act's ineligibility provision, 7 U.S.C. § 1421 note, § 231. *Hanson v. Madigan,* 788 F.Supp. 403 (W.D.Wis.1992). For the reasons that follow, we reverse the judgment of the district court and reinstate the Secretary's decision.

I

BACKGROUND

A. *Administrative Proceedings*

Christian and Evan Hanson are brothers and general partners of Hanson Farms, a partnership located in St. Croix County, Wisconsin. In 1988, a catastrophic drought devastated farms throughout the Midwest, including Hanson Farms. As a result, the Hansons applied for disaster assistance to the St. Croix County Committee of the Agricultural Stabilization and Conservation Service ("the ASCS")[1] pursuant to the Act. On

---

[**] The Honorable Ann Claire Williams, Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. Local ASCS committees exist to assist the Commodity Credit Corporation ("the CCC") implement farm subsidy programs pursuant to the Agricultural Adjustment Act of 1949. *See* 15 U.S.C. §§ 714c, 714i (1988). While the CCC handles the funding of the subsidy programs, the state and county ASCS committees are responsi-

ble for their day-to-day administration, such as determining eligibility for the programs. The Deputy Administrator of the ASCS, located in Washington, D.C., promulgates regulations to implement the farm subsidy programs and also serves as the Secretary's final arbiter in the administrative appeals process. *See Stegall v. United States,* 19 Cl.Ct. 765, 768 n. 2 (1990). In 1988, the Hansons contracted with the CCC to engage in various agricultural practices in con-

January 12, 1989, the ASCS committee approved the Hansons' application for benefits, issuing a check for $51,218.00 the following day.

However, on December 13, 1989, the Executive Director of the St. Croix County Committee of the ASCS, Richard A. Gade, wrote to Christian Hanson. He requested a copy of Mr. Hanson's 1987 IRS Form 1040. Not long thereafter, Mr. Gade requested the same form from Evan Hanson. Although the brothers had certified on their original applications that their individual gross incomes for 1987 had not exceeded $2 million, Mr. Gade informed the brothers that he was reexamining the matter to determine their eligibility for disaster benefits. The Hansons provided the 1040 forms and all accompanying supplemental schedules, which showed that Christian Hanson's gross revenues from all sources totaled $90,398.82, and that Evan Hanson's gross revenues from all sources totaled $47,245.94.

Nonetheless, on February 15, 1990, Mr. Gade notified the Hansons that they were ineligible for benefits because they individually exceeded the Act's $2 million limit on qualifying gross revenues. Mr. Gade and the ASCS committee based this determination on oral statements Christian Hanson made to Mr. Gade on January 4, 1990 concerning the gross revenues of each of the brothers' nonfarm corporations. R. 194. Christian Hanson's statements were in reference to the Hansons' other business activities. In addition to the Hanson Farms partnership, Christian Hanson was the sole shareholder of the Douglas–Hanson Company, an unrelated nonfarm corporation that in 1987 reported a net loss on gross sales of over $9 million. Evan Hanson was the sole shareholder of Rochester Institutional Foods, also an unre-

lated nonfarm corporation; it realized a 1987 net profit of approximately $25,000 on gross sales of slightly over $2 million. R. 173. Based on these companies' gross revenues, and the fact that each individual's farm income was less than fifty percent of his total gross income, Mr. Gade and the ASCS committee found the Hansons ineligible for disaster benefits under the Act.

On April 12, 1990, the Hansons appealed the decision to the Wisconsin State ASCS Committee. They argued that the Act did not authorize the inclusion of the gross sales revenues of their unrelated nonfarm corporations in the calculation of their individual gross incomes. However, on June 19, 1990, the state ASCS committee affirmed the County Committee's ruling as well as its reasoning. The Hansons appealed this decision to the Deputy Administrator of the ASCS in Washington, D.C., who also affirmed the ineligibility decision, reiterating that each of the Hansons "individually received less than 50 percent of their income from farming. As a result income from all sources was used in determining qualifying gross income individually." R. 2.

### B. District Court Proceedings

The Hansons brought an action in the district court for review of the Secretary's decision pursuant to 5 U.S.C. §§ 701–06 (1988). The Secretary contended that its determination regarding the Hansons' gross revenues was, as a finding of fact, "final and conclusive" pursuant to 7 U.S.C. § 1385 and § 1429 (1988). The district court conceded *arguendo* that those provisions barred review of the Secretary's findings of fact made in connection with the Act.[2] Nonetheless, because the district court found that the Secretary based his findings on an inaccurate in-

sideration for CCC payments. They thus were able to apply for benefits under the Act.

**2.** The district court questioned whether either 7 U.S.C. § 1385 or § 1429 actually prevented review of findings of fact made under the Act. First, § 1385 bars the review of any findings of fact constituting the basis for payments under specifically listed agricultural programs, as well as any loan or price support operations. But the district court pointed out that § 1385 does not mention disaster assistance payments of any

kind. Second, § 1429 states that the Secretary's determinations under the Agricultural Act of 1949 are final and conclusive; however, the Secretary did not contend in the district court that the Act is part of the Agricultural Act of 1949. *Hanson*, 788 F.Supp. at 406. Because the Secretary concedes on appeal that the issue of his interpretation is a question of law, Appellant's Br. at 22, we need not examine whether § 1385 or § 1429 bars review of the Secretary's findings of fact made under the Act.

terpretation of law, it proceeded to review the Secretary's determination. *Hanson*, 788 F.Supp. at 406.

The district court's main inquiry focused on the Secretary's interpretation of "person" in two sections of the Act, payment limitations and ineligibility. 7 U.S.C. § 1421 note, §§ 211, 231. In reaching his decision to deny the Hansons benefits, the Secretary gave the word "person" in the ineligibility section the same meaning as the definition of "person" in the payment limitations section, the latter of which the Secretary had defined pursuant to explicit congressional authorization. *See* 7 U.S.C. § 1421 note, § 211(d)(1). The district court, however, rejected the Secretary's interpretation of "person" in the ineligibility section for three reasons.

First, the court stated that the record did not support the Secretary's argument that such an interpretation constituted the Secretary's regular procedure and therefore deserved deference. *Hanson*, 788 F.Supp. at 409. Second, regardless of whether it was the Secretary's regular practice to give the term "person" the same meaning for both payment limitations and ineligibility purposes, the district court concluded it owed no deference to such an interpretation because it was not "based on a permissible construction of the applicable statute." *Id.* (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)). The court found no significance in the 1989 Disaster Act's incorporation of the Secretary's use of the same definition of "person" in both the payment limitations and the ineligibility section. *Hanson*, 788 F.Supp. at 408–09; *see* 7 U.S.C. § 1421 note, §§ 109, 151. Finally, the court stated, albeit in conclusory fashion, that the interpretation did not comport with procedural fairness because

it did not conform with other rules the Secretary had promulgated and made known to the public. *Hanson*, 788 F.Supp. at 409. Accordingly, the district court denied the Secretary's motion for summary judgment and granted the Hansons' cross-motion for summary judgment.

## II

## ANALYSIS

We now turn to the merits. We shall first determine the applicable standard of review. We shall then examine the provisions of the Act and corresponding regulations that are at issue in this appeal. Finally, we shall assess the submissions of the Secretary and the Hansons with respect to the appropriate interpretation of these statutes and regulations.

### A. *Standard of Review*

Our starting point in reviewing the Secretary's determination is the Administrative Procedure Act ("the APA"). The APA states that a reviewing court should set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1988). In applying this standard, we must focus on "the administrative record already in existence," not on any "new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam). Thus, we need accord no deference to the district court's disposition. *See Daviess County Hosp. v. Bowen*, 811 F.2d 338, 342–43 (7th Cir.1987); *Sierra Club v. Davies*, 955 F.2d 1188, 1192 (8th Cir.1992).

*Chevron* mandates that our review be twofold.[3] First, if Congress has directly ad-

---

**3.** The Hansons contend that *Chevron* principles do not govern our review of the Secretary's determination. Rather, they offer as the applicable standard of review a snippet from an opinion of this court: " '[T]he courts have the reserve of power to substitute their own judgment on all questions of statutory interpretation.' " *Doe v. Reivitz*, 830 F.2d 1441, 1447 (7th Cir.1987) (quoting 2 Kenneth C. Davis, *Administrative Law Treatise*, § 7:11, at 55 (1979)), *amended*, 842 F.2d 194 (7th Cir.1988). We cannot accept the Han-

sons' argument. In *Doe*, the court's statement referred to the review of informal "interpretive documents," not "legislative rules." Legislative rules are regulations that an agency has issued pursuant to a congressional delegation of authority and has promulgated in accordance with "the normal procedures associated with force-of-law rule making," namely, "notice-and-comment rule making pursuant to [5 U.S.C. § 553 of the APA]." *Doe*, 830 F.2d at 1446; *see also Metropolitan School Dist. v. Davila*, 969 F.2d 485, 490 (7th

dressed the statutory question at issue, the matter is resolved, as we shall "give effect to the unambiguously expressed intent of Congress." *Id.* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. In determining congressional intent, we " 'look to the particular statutory language at issue, as well as the language and design of the statute as a whole.' " *Orrego v. 833 West Buena Joint Venture*, 943 F.2d 730, 734 (7th Cir.1991) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988)). Second, if Congress has not directly addressed the issue, we inquire only whether the Secretary based his decision on "a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782 (footnote omitted). In undertaking such an inquiry, we cannot substitute our own construction of the Act for the Secretary's if his interpretation is reasonable. *Id.* at 844, 104 S.Ct. at 2782. Rather, we owe the Secretary's interpretation of the Act deference because "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Id.*

## B. *The Act and Corresponding Regulations*

At issue in this appeal is the Secretary's interpretation of the term "person" in the ineligibility section of the Act. We therefore must ascertain the Secretary's interpretation and then determine whether it was acceptable under the appropriate standard of review.

To be eligible for disaster benefits under the Act, a "person" must not have had "qualifying gross revenues in excess of $2,000,-000.00 annually, as determined by the Secre-

tary of Agriculture." 7 U.S.C. § 1421 note, § 231(a). In determining "qualifying gross revenues," the statute directed the Secretary to consider only a person's gross revenues from farming, ranching, and forestry operations if the person received the majority of his or her annual income for the preceding year from farming, ranching, or forestry operations. § 231(b)(1). If the person received less than a majority of his or her annual income from those operations, the Secretary was to consider "the person's gross revenues from all sources." § 231(b)(2).

In making eligibility determinations under § 231, the Secretary construed "person" to mean the same as it did in § 211, the payments limitations section. Section 211(a) imposed a $100,000 limitation on the disaster payment that any "person" could receive. Moreover, the provision gave the Secretary authority to issue regulations defining the term "person." § 211(d)(1). The subsection directed the Secretary to define "person," to the extent possible, in accordance with the regulations defining the term "person" issued under the Food Security Act of 1985. *Id.*

The regulation defining "person" for, among other things, the Food Security Act of 1985, is found in 7 C.F.R. § 795.3(b)(1). It states that "person" means an individual, corporation, or other legal entity. To be considered a separate "person," the individual or legal entity must have a separate and distinct interest in the crop or land on which the crop is produced, a separate responsibility for such interest, and be responsible for payment of the costs of farming related to such interest, separate from that of any other

Cir.1992), *cert. denied*, ⎯ U.S. ⎯, 113 S.Ct. 1360, 122 L.Ed.2d 740 (1993).

The *Doe* court did not apply *Chevron* standards of review because the policy at issue had neither been promulgated pursuant to congressional authority nor been subjected to the notice-and-comment rulemaking process. *Id.* It was thus a mere "interpretive rule," as described in 5 U.S.C. § 553(b)(A). In contrast, the Secretary's decision in this case was based on 7 C.F.R. § 1477.3(g), a rule promulgated pursuant to an explicit delegation of authority by Congress. *See* 7 U.S.C. § 1421 note, §§ 231, 234. Moreover, Congress was aware that the rules the Secretary promulgated to implement the Act would be formal, substantive force-of-law rules. One sees

this plainly in 7 U.S.C. § 1421 note, § 234, in which Congress explicitly directed the Secretary *not* to engage in notice-and-comment procedures because of the need to implement the Act quickly. Congress would not have given express exemption from notice-and-comment procedures without assuming that the Secretary's regulations were to be promulgated pursuant to the normal procedures of legislative rules. After all, interpretive rules are already exempt from the APA's notice-and-comment requirement. 5 U.S.C. § 553(b)(A); *Indiana v. Sullivan*, 934 F.2d 853, 856 (7th Cir.1991). Thus, *Chevron* is the proper standard by which to review the Secretary's determinations at issue in this appeal.

individual or entity. § 795.3(b)(1)(i)–(iii). Section 795 also covers the status of corporations:

> A corporation (including a limited partnership) shall be considered as one person, and an individual stockholder of the corporation may be considered as a separate person to the extent that such stockholder is engaged in the production of the crop as a separate producer and otherwise meets the requirements of § 795.3, except that a corporation in which more than 50 percent of the stock is owned by an individual ..., or by a legal entity, shall not be considered as a separate person from such individual or legal entity.

7 C.F.R. § 795.8(a).

The Secretary determined that this schematic definition of the term "person," which the Secretary employed in the payment limitations section pursuant to explicit congressional authority in § 211(d)(1), should also control the meaning of "person" in the ineligibility provision. As a result, the Secretary issued 7 C.F.R. § 1477.3(g) to govern who qualifies under the Act as an "eligible producer." It states that "a person, as defined in Part 795 of this Title, who has annual gross income in excess of $2.0 million shall not be eligible to receive disaster payments under this Part." § 1477.3(g).

The crux of this appeal is the Secretary's decision to apply the same definition of "person" in both the payments limitations section and the ineligibility section. By doing so, Christian and Evan Hanson were, for eligibility purposes, no longer "persons" with gross revenues of $90,398.82 and $47,245.94, respectively, as their IRS Form 1040s stated. Rather, the Secretary found each brother and his respective corporation to be one "person" because each owned more than fifty percent of the respective stock. See 7 C.F.R. §§ 795.8(a), 1477.3(g). Owing to this, the Secretary also found that the Hansons received less than a majority of their individual gross incomes from farming. Thus, pursuant to § 231(b)(2), the eligibility section, the Secretary calculated each Hanson brother's "qualifying gross revenues" by aggregating his individual gross revenues from all sources, including the unrelated nonfarm cor-porations of which he was the sole shareholder. As a result, the Hansons were ineligible for disaster benefits under § 231(a) of the Act, as each corporation alone had gross revenues exceeding $2 million.

## C. Review of the Secretary's Interpretation

### 1.

■ The Secretary submits that the plain language of the Act supports his interpretation of "person" in § 231, showing that Congress has addressed directly the question at issue. He relies on the language of § 231(a), which rendered ineligible a "person that has qualifying gross revenues in excess of $2,000,000 annually, as determined by the Secretary of Agriculture." Thus, the Secretary maintains that, under *Chevron*'s first stage of review, we should give effect to the intent of Congress and reinstate his decision.

In contrast, the Hansons argue that, although § 231(a) instructed the Secretary to determine "qualifying gross revenues," it did not explicitly authorize him to define "person" for purposes of that section. Moreover, this absence of explicit authority in § 231(a), they maintain, is significant in light of the explicit directive Congress gave to the Secretary to define "person" in the payment limitations section. See § 211(d)(1). Accordingly, the Hansons contend that the plain language of the Act does not support the Secretary's interpretation and denial of benefits.

We cannot accept the Secretary's submission that we can dispose of this case under the first *Chevron* step. Congress simply has not "directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781. The Act neither explicitly authorized the Secretary to define "person" for purposes of § 231 nor directed him to borrow the definition Congress instructed him to promulgate for § 211. As a result, we cannot say that "the intent of Congress is clear" enough to make this "the end of the matter." *Id.*

### 2.

We therefore must decide this appeal under the second *Chevron* step. Thus, we shall examine whether the Secretary based his

interpretation and decision on a permissible construction of the statute. *Id.* at 843, 104 S.Ct. at 2782. According to the Secretary, we should conclude that his interpretation of the term "person" in § 231 is reasonable for three reasons.

First, the Secretary contends that, even if Congress has not directly addressed his interpretation of "person" in § 231, the text, design, and history of the Act show the interpretation to be at least a permissible construction of the statute. At the outset, the Secretary places significance on Congress' incorporation of his definition of "person" for the ineligibility section of the subsequent Disaster Act of 1989. *See* 7 U.S.C. § 1421 note, §§ 109, 151. Moreover, the 1988 Act, as the Secretary reads it, limited disaster support to producers who were most in need and who were most dependant on agriculture for their livelihood. It was for this reason that Congress enacted § 231 and imposed a $2 million cap on qualifying gross revenues for eligibility purposes. In addition, Congress directed that qualifying gross revenues come from all sources if the person applying received less than half of his annual income from farming. *See* § 231(b)(2). The Secretary asserts that the use of gross revenues, and not net income, to determine eligibility indicates that Congress intended § 231 to exclude persons engaged in large business concerns, even unsuccessful ones, from obtaining benefits under the Act. Congress' goal in doing so, says the Secretary, was to favor the small farmer. Thus, the Secretary argues that his definition of "person" for § 231, which combines a person's farm gross revenues with his majority-owned non-farm corporation's gross revenues, is consistent with the Act's legislative purpose. This conclusion is also supported, the Secretary submits, by Congress' explicit direction to the Secretary to adopt a definition of "person" that allowed the Secretary to combine a person's farm and non-farm gross revenues for payment limitations purposes. *See* § 211; 7 C.F.R. §§ 795.3(b)(1), 795.8(a).

Second, the Secretary submits that his construction of the Act is permissible because it is necessary to carry out Congress' explicit directives. Specifically, in order to define "qualifying gross revenues," as Congress directed the Secretary to do in § 231(a), the Secretary states that it was first necessary to define the term "person" in § 231(a). Borrowing the definition of "person" from another section within the Act, the Secretary argues, was reasonable in light of Congress' directive.

Finally, the Secretary contends that it was sensible to use a consistent definition of the same term in determining ineligibility and payment limitations. At oral argument, the Secretary pointed out that local county committees implemented the provisions of the Act and that a consistent definition for an identical term facilitated easier administration of the Act.

In response, the Hansons argue that Congress intended the Secretary to employ only the plain meaning of the term "person" in § 231, not the meaning of "person" in § 211. They claim that this court should accord no significance to the 1989 Disaster Act's extension of § 211's definition of "person" to ineligibility determinations. The legislative intent behind the change, the Hansons say, is unclear.

Moreover, the Hansons assert that the Secretary's adoption of § 211's definition of "person" for § 231 is impermissible because Congress intended the Secretary to use § 211's definition only for that section. Congress directed the Secretary to use a specific definition for payment limitations to prevent large farming operations from entering into "sham transactions to obtain a windfall from farm subsidies." *Stegall v. United States,* 19 Cl.Ct. 765, 769 (1990). By including particular nonfarm sources of income in payment limitations determinations, Congress attempted to stop agricultural concerns from intentionally breaking into multiple "persons" in order to recover multiple benefit awards. *See* H.R.Rep. No. 93–337, 93d Cong., 1st Sess. (1973), *reprinted in* 1973 U.S.C.C.A.N. 1750, 1759, 1761. As a result, the Secretary promulgated 7 C.F.R. § 795.-3(b)(1), defining "person" in order to limit such activity under provisions like § 211. Thus, the Secretary's use of § 211's definition for ineligibility purposes under § 231,

the Hansons claim, is inconsistent with the congressional intent behind the definition.[4]

We agree with the Hansons that, under the circumstances here, little reliance ought to be placed on the 1989 Disaster Act's extension of § 211's definition of "person" to the ineligibility analysis. In *Orrego v. 833 West Buena Joint Venture,* 943 F.2d 730, 736 (7th Cir.1991), we noted the "dangers in looking to subsequent legislative enactments to determine the meaning of an earlier statute." Although in *Orrego* we did in fact look to a subsequent enactment, we did so only because there existed clear subsequent legislative history. *Id.* at 736–37. In this case, we do not have the benefit of such history and would be forced to speculate about Congress' intent in the 1989 Act.

Nevertheless, the Secretary's interpretation of "person" in § 231 is permissible under *Chevron's* deferential standard of review. Not unreasonably, the Secretary reads the Act as having addressed the plight of the more needy and agriculturally-dependent farmers. Section 241 of the Act supports such an interpretation; it declares that it was the "sense of Congress" that the disaster payments were intended to "preserve each producer's livelihood." Moreover, the $2 million limit on qualifying gross revenues from either farm or, in some cases, farm and nonfarm sources[5] also supports the Secretary's view that the Act focuses on the smaller farmers who rely most heavily on agricultural operations.

The Secretary's interpretation of "person" in § 231 was consistent with this focus. It is reasonable to conclude that it effectuates the Act's purpose by denying eligibility to those who are majority owners of substantial nonfarm operations—in this case, wholly-owned corporations with gross revenues exceeding $2 million.[6] Congress, after all, did not pass the Act to open government assistance to every farmer who suffered agricultural losses in 1988. Rather, the text and the history of the Act indicate that the general intent behind § 231 was to direct the Act's benefits to relatively small farmers who suffered economic hardship at the hands of a disastrous growing season.

In addition, Congress' express directive in § 231 for the Secretary to determine "qualifying gross revenues" necessitates defining "person" if the Secretary is to implement the Act. The Hansons argue that it was improper for the Secretary to give "person" any

4. The Hansons also argue that the ineligibility interpretation is inconsistent with the provisions of the internal implementation handbook that the Secretary distributed to ASCS officials. However, because these provisions are not force-of-law regulations, *see supra* note 3, we do not view them to be on the same par with the Act and its implementing regulations. Instead, the internal guidelines merely "elaborate requirements that are implicit in the regulations already." *Westcott v. USDA,* 765 F.2d 121, 122 (8th Cir.1985); *see* 5 U.S.C. § 553(b)(A). As a result, we confine our review to the Act and the Secretary's regulations.

5. Even under the Hansons' desired construction of the statute, nonfarm revenues that the "person" individually realized as gross income would constitute "qualifying gross revenues" under § 231, at least as long as a majority of the person's gross revenues came from nonfarm sources. However, the Hansons' construction of the statute could allow receipt of relief funds under circumstances incompatible with the purposes of the statute. For example, a person applying for benefits under the Act might have been the sole or majority shareholder of a corporation that in 1987 realized net profits of several million dollars on gross sales vastly exceeding that figure. Nevertheless, so long as that sole or majority shareholder did not realize any of this profit as personal gross income (i.e., the corporation kept it as retained earnings), the person's "qualifying gross revenues" under § 231 could be zero if he took a loss in his only business operation as a "person," farming. Under the Hansons' proposed construction of the statute, the Secretary would have to pay that person disaster benefits, when in actual fact the person enjoyed a banner economic year. We cannot say the Secretary was unreasonable in avoiding a construction of the Act that would make such a scenario possible.

6. The district court found that "the record shows nothing about the gross sales or gross revenues of either corporation in 1987." *Hanson,* 788 F.Supp. at 406. However, we agree with the Secretary that the administrative record clearly shows otherwise. Christian Hanson told Mr. Gade in a January 4, 1990 meeting that each brother's nonfarm corporation took in gross revenues in excess of $2 million. R. 182. Moreover, an April 12, 1990 letter from the Hansons' counsel to the Wisconsin State ASCS Committee admits these figures to be true. R. 173. In addition, the complaint the Hansons filed with the district court also concedes these facts. R. 2 at 10.

other meaning than a "plain" one.[7] It is not at all apparent, however, that the term "person" has a plain meaning in the context of the Act.[8] Congress had already in the Act given the term "person" a meaning other than its "plain" one. Thus, the Secretary acted well within his delegatory limits in determining that the term's complex definition elsewhere in the Act did not cease to be relevant when Congress used the term again later in the Act. In short, it was reasonable, absent statutory directive or legislative history to the contrary, for the Secretary to define "person" in the same way that Congress defined the same term in the same Act. *Cf. Local No. 111 v. NLRB,* 946 F.2d 1264, 1267 (7th Cir.1991) (stating that an agency's interpretation "not precluded by statutory language or clear congressional intent" should be honored). This is especially true in light of the "considerable weight" we must give to the Secretary's "construction of a statutory scheme [he] is entrusted to administer." *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782.[9]

It is true that § 211's definition of "person," as found in 7 C.F.R. § 795.3(b)(1), has its origins in limiting the formation of multiple sham corporations for purposes of payment limitations in various agricultural programs. *See Stegall,* 19 Cl.Ct. at 769. One can therefore question, as the Hansons have, whether Congress intended the Secretary to

employ that definition in making eligibility determinations. However, our task under *Chevron* is not to substitute another reasonable construction of § 231 for the Secretary's. *Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11 (stating that the reviewing court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction"). Rather, we are to inquire only whether the Secretary's decision to define "person" consistently throughout the Act was a permissible construction of the statute. We hold that it was.

### 3.

■ The Hansons argue in the alternative that the Secretary acted contrary to law when, in making eligibility determinations pursuant to 7 C.F.R. § 1477.3(g), he interpreted "gross income" to include "gross sales." Conventional tax and accounting parlance, they maintain, do not equate the two, nor should the Secretary. We do not agree. It is an "established proposition that an agency's construction of its own regulations is entitled to substantial deference." *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 2342, 90 L.Ed.2d 921 (1986) (citations omitted); *see also Wisconsin Elec. Power Co. v. Reilly,* 893 F.2d 901, 907 (7th Cir.1990). This principle is particularly true here be-

---

7. In actual fact, not even the Hansons suggest that "person" in § 231 be given its "plain meaning." They argue that the Secretary should have read "person" to mean "producer" as used in § 201(a) and § 202(a). The Hansons do not elaborate on why the plain meaning of "person" should be the definition of a different word (producer) in the same Act instead of that of the same word in the same Act.

8. Judge Easterbrook expressed the practical limitations on rigid literalism well:

Statutes have meanings, sometimes even "plain" ones, but these do not spring directly from the page. Words are arbitrary signs, having meaning only to the extent writers and readers share an understanding.... Language in general, and legislation in particular, is a social enterprise to which both speakers and listeners contribute, drawing on background understandings and the structure and circumstances of the utterance. Slicing a statute into phrases while ignoring their contexts—the surrounding words, the setting of the enactment, the function a phrase serves in

the statutory structure—is a formula for disaster.

*Herrmann v. Cencom Cable Assoc., Inc.,* 978 F.2d 978, 982 (7th Cir.1992).

9. We also find support for the Secretary's interpretation in § 234 of the Act. It directed the Secretary to "issue regulations to implement the provisions of this title as soon as possible." Moreover, Congress instructed the Secretary to do so "without regard to the requirement for notice and public participation in rulemaking prescribed in [5 U.S.C. § 553]." § 234. This directive alone speaks to the discretion Congress gave to the Secretary in implementing and interpreting the Act. It also shows the reasonableness of the Secretary's attempt to achieve the legislative goal of implementing the Act quickly and effectively on the national, state, and local levels by using a consistent definition of "person" throughout the Act. In light of Congress' goal of rapid determinations and disbursements, we cannot find the Secretary's efforts in facilitating administrative ease to have been arbitrary or capricious.

cause Congress expressly specified in § 231 of the Act that the Secretary was to determine the meaning of "qualifying gross revenues." Although this very deferential standard does not reduce our review to a rubber stamp, it more than justifies the Secretary's interpretation of § 1477.3(g). Neither the statutory language nor the legislative history is inconsistent with the Secretary's decision to interpret "gross income" in § 1477 and "gross revenues" in § 231 as entailing gross sales in determining the eligibility of an applicant.[10]

### Conclusion

For the foregoing reasons, we reverse the judgment of the district court and reinstate the Secretary's determination.

REVERSED.

---

10. If anything, the legislative history shows that the Secretary's interpretation was in full accordance with congressional intent. Debate in the House on the adoption of an early version of the eligibility section of the Act including the phrase "annual gross income as determined by the Secretary" is some support for this conclusion:

Mr. Brown of Colorado: Do I understand the amendment only deals with gross sales and not with net increase?

Mr. Schumer: The gentleman is correct.

Mr. Brown of Colorado: So, it is possible that someone can have $2 million in sales or more and have a net loss and be excluded from this assistance.

Mr. Schumer: The gentleman is correct. 134 Cong.Rec. 19,529 (1988). Other House colloquies reveal Congress' concern over the administrative problems that would arise if the eligibility scheme were based on anything but gross revenues. *Id.* at 19,529–31. Although we fully realize the perils of legislative history, *see Matter of Sinclair*, 870 F.2d 1340, 1343 (7th Cir.1989) (stating that pre-enactment legislative history is often "losers' history"), in this case it provides some support for the Secretary's submission that use of the terms "gross revenues" in § 231 and "gross income" in § 1477.3(g) entailed inclusion of an applicant's gross sales.