**HORN FARMS, INC., Plaintiff,**

v.

**Ann M. VENEMAN, Secretary, U.S. Department of Agriculture, et. al, Defendants.**

**Cause No. 3:02 CV–0831 AS.**

United States District Court, N.D. Indiana, South Bend Division.

May 20, 2004.

Brandon L Jensen, PHV, Karen Budd–Falen, PHV, Budd–Falen Law Offices PC, Cheyenne, WY, for Defendant.

Clifford D Johnson, U.S. Attorney's Office—SB/IN, South Bend, IN, for Defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

This cause is before the Court on cross motions for summary judgment. The Plaintiffs brought suit under the Administrative Procedures Act, asking this Court to review the decision of the United States

Department of Agriculture to terminate Horn Farms from a variety of farm subsidy programs. The parties have briefed the issues, and on March 3, 2004, this Court heard oral argument on the motions After considering the submissions of the parties and the oral arguments, the Court now rules as follows.

## I. JURISDICTION

Jurisdiction is premised upon the Administrative Procedures Act (the "APA"), 5 U.S.C. §§ 706(1) & (2), which gives federal courts jurisdiction to review agency decisions, and federal question jurisdiction under 28 U.S.C. § 1331.

## II. RELEVANT FACTS

The facts are not in dispute in this case. The Plaintiff, Horn Farms, Inc., ("Horn Farms") is owned and operated by Gene Horn, who currently owns and farms approximately 1400 acres in Fulton and Cass Counties in Indiana. Pl.'s Mem. in Supp. at 4. Some of this land was purchased in 1995, including the parcels at issue in this case. Id. at 5, n. 4,6. The purchased land included several small tracts that the Natural Resources Conservation Service (the "NRCS") later determined to be wetlands. After noticing pieces of broken drain tiles in the area, and speaking with neighbors, Mr. Horn determined that these tracts had previously been farmed, but had reverted to wetlands through lack of maintenance of the drain tile system. Admin. R. at p. 6. Therefore, in 1998, he cleared several tracts and restored the drain tile system. Id.

Up to that time, Gene Horn and Horn Farms were eligible to participate in various farm subsidy programs administered by the United States Department of Agriculture (the "USDA") which allowed them to receive various loans and payments. Id. As part of the eligibility requirements for participation in these programs, a representative for Horn Farms executed Form AD–1026, agreeing not to grow crops on wetlands converted after 1985, and not to convert wetlands for the purpose of growing crops. Def.'s Mem. in Supp. at 1–2.

On January 28, 1999, Robert Baker, the operator of one of Plaintiff's farms, requested a wetland determination on certain property owned by Horn Farms. Pl.'s Mem. in Supp. at 2. On February 8, 1999, the Fulton County Farm Service Agency[1] office (the "FSA") requested that the NRCS[2] conduct a wetland spot check on two tracts owned by Horn Farms: tract 3713; and tract 13599. Def.s' Mem. in Supp. at 2. On March 22, 1999, NRCS representative Albert Tinsley conducted a site-assessment with Mr. Horn present in order to evaluate the wetland areas in question. Id.; Pl.'s Mem. in Supp. at 5.

The results of Tinsley's field visit formed the basis for the NRCS's determination, and will therefore be included in some detail. His field notes state that according to slides reviewed, six of the areas he looked at had been in trees from prior to 1981, and that one site had growing cat-tails and rushes due to continuing inundation and saturation. Admin. R. at p. 75. He said that five sites bore evi-

---

**1.** The Farm Service Agency (FSA) was created in 1994 to replace the Agricultural Stabilization and Conservation Agency (the ASCS). *United States v. Dierckman,* 201 F.3d 915, 917, n. 4 (7th Cir.2000); *see also,* Public L. No. 103–354, § 226(1994)(codified at 7 U.S.C. § 6932) and 60 Fed.Reg. 56,392 (Nov. 8, 1995)(changing the name of the newly creat-

ed Consolidated Farm Service Agency to the Farm Service Agency).

**2.** The NRCS was also created in 1994, and took over the services formerly provided by the Soil Conversation Service (the "SCS"). *See, Dierckman,* 201 F.3d at 917, n. 3; and Pub.L. No. 103–354, § 246 (1994)(codified at 7 U.S.C. § 6962).

dence of being converted wetlands, with actual saturation in spite of the new tile system and risers installed. Id. They also had the remnants of wetland plants in the form of twigs, sticks and root wads, and in some places, surviving plants. Id.

Tinsley's notes state that he did observe evidence of past drainage, in the form of tile chips and broken pieces, but "since these areas were all in mature trees prior to 1981, there is no evidence that the drainage systems were actually working during or prior to 1981." Id. He says, "The chronology of this field appears to be that it was drained many decades ago, the system stopped functioning, trees had returned sometime no later than in the 1970's and were not suitable for a determination of PC [prior-converted wetland] during the pertinent 1981–1985 time frame for purposes of the Farm Bill provisions or the 1993–1998 time frame for purposes of the Clean Water Act." Id.

The NRCS reviewed the results from the onsite assessment and remote images and determined that some of the tracts in question were wetlands converted after November 28, 1990. Pl.'s Mem. in Supp. at 2; Def.s' Mem. in Supp. at 7. This is significant in terms of wetlands conversion because a new, more stringent version of the Swampbuster provisions went into effect on that date. The NRCS determined that four wetlands were converted on Tract No. 13599, consisting of 0.4, 0.5, 1.8, and 2.1 acres. Id. The NRCS noted that these wetlands had been cleared of trees and vegetation, and drainage tiles installed in order to facilitate the production of agricultural products, but that no farming activities had yet occurred in these areas. Id. In addition, the NRCS stated that one wetland had been converted on Tract No.

980, consisting of 1.4 acres, for a total of 6.2 acres of converted wetlands. Id.

Plaintiff Gene Horn was notified by letter on May 5, 1999, that the NRCS had made "a preliminary technical determination" that he had converted 6.2 acres of wetlands in violation of the Food Security Act of 1985, as amended by the Food, Agriculture, Conservation, and Trade Act of 1990, and the Federal Agricultural Improvement and Reform Act of 1996. Admin. R. at p. 72. The letter informed Mr. Horn that the preliminary determination would become final within 30 days unless he appealed or asked for mediation. Admin. R. at pp. 72–3. On June 10, 1999, the FSA notified Mr. Horn that unless he took action to mitigate the loss of the converted wetlands, he would be ineligible for benefits under certain programs administered by the USDA. Def.'s Stmt. of Mat. Facts at 4.[3] Based on the preliminary technical determination, Mr. Horn's benefits were terminated beginning with the 1999 crop year, and he remains ineligible until he either restores the wetlands or mitigates their loss before January 1 of the subsequent crop year. Id.

Mr. Horn asked for mediation, but there was a substantial delay in getting the session scheduled because of difficulties in the office of the Indiana Commissioner of Agriculture. Def.s' Reply at 4. During this time, on January 31, 2000, Tinsley sent a letter to Mr. Horn explaining his options, that he could choose not to participate in the USDA farm support programs, or he could restore the converted wetlands in place. Admin. R. at p. 55.

When the mediation was finally held on March 28, 2001, the discussion was primarily about the options the agency could offer

---

3. The Defendant's factual statement says that this letter was sent, but there is no citation to the record. Although it is not required to do so, the Court has searched the record and is unable to find this letter. It is relevant on the issue of whether the Defendants offered the Plaintiff an opportunity to come into compliance before terminating his benefits.

Horn Farms to get back into compliance so that it could regain eligibility for program benefits. Banks Aff. at p. 1. The mediation failed to produce an agreement. On May 16, 2001, Tinsley sent another letter to Mr. Horn explaining the steps he would need to take if he chose to mitigate the loss of the converted wetlands. Admin. R. at p. 502. Mr. Horn's understanding of the mitigation plan was that it required him to set apart possibly as much as 32 acres of farmland and turn it into a wetland to offset the loss of the 6.2 acres that he cleared. Pl.'s Mem. in Supp. at p. 6; Admin. R. at 128.[4] Mr. Horn found this mitigation plan unacceptable, primarily due to the discrepancy between the amount of wetlands converted and the amount of acreage potentially required for restoration and mitigation. Id.

On May 25, 2001, Mr. Horn proposed an alternative wetlands conservation plan. Admin. R. at p. 512-13. He offered to set aside and permanently protect 40 acres of wetlands on his remaining farmland properties, in addition to a reduction in support payments proportional to the amount of wetlands he converted to farm use. Id. As long as Mr. Horn remains out of the USDA's farm subsidy programs, he is not under the Swampbuster restrictions that prevent the conversion of wetlands to farm use. Id. The Record does not indicate that the agency considered Mr. Horn's proposal.

After the failure of the mediation process, Mr. Horn filed an appeal with the Farm Service Agency County Committee in Fulton County, Indiana, pursuant to C.F.R. Part 780. Pl.'s Mem. in Supp. at p. 7. He presented evidence to support the following claims: (1) that the six acres in

question fell within an exception to the Act for "prior-converted wetlands"; (2) that NRCS did not make a determination on the "good faith" issue; (3) that the termination of all benefits was inappropriate; and (4) that ignoring his settlement proposal was contrary to the public interest. Def.'s Mem. in Supp. at p. 4; Admin. R. at pp. 217–224.

The County Committee held an informal hearing on October 17, 2001, regarding Mr. Horn's administrative appeal, and the next day, the Committee issued its decision. Pl.'s Mem. in Supp. at p. 7–8. The County Committee "determined that merit could not be found in regards to making a recommendation the NRCS technical determination be reviewed by the Indiana NRCS State Conservationist." Id. at 8; Def.s' Mem in Supp. at 5. In addition, the County Committee determined that they did not have authority to reverse a technical determination by the NRCS, and denied his appeal in its entirety. Id. The Committee advised Horn Farms of its appeal rights, and advised it that it would forward Horn Farm's Good Faith Determination Forms to NRCS for processing. Def.s' Mem. in Supp. at 5. The Committee advised that it lacked the authority to act on a settlement proposal, but that it could make a recommendation on the relief of penalties when the Good Faith Determination was returned by NRCS. Id.

Horn Farms appealed the Committee's decision and the underlying technical determination to the National Appeals Division, asking for a "record review". Pl.'s Mem. in Supp. at p. 8. The hearing officer, Michael E. Jacobs, issued a written decision stating that the National Appeals Di-

---

**4.** Tinsley's letter dated May 11, 2001, states that the Wetland Mitigation Ratio Key included in the record is only a sample, used as an example. Admin. R. at p. 126. Again, although it is not required to, the Court has searched the record and is unable to find anything that documents the amount of acreage Plaintiff would be required to put into a wetland in order to mitigate the loss of the 6.2 acres.

vision did not have subject-matter jurisdiction to conduct a record review because there exists "no authority to hold a hearing or review of the record on the denial of the Fulton County FSA Committee (COC) to seek a technical review by the Indiana NRCS State Conservationist". Id.; Admin. R. at p. 272. He further stated that the NAD had no jurisdiction in this matter because "an appeal of the Fulton County Committee to not seek the NRCS State Conservationist to review the technical determination is of general applicability and policy." Id.

Horn Farms asked for reconsideration of this determination, which was denied, then sought review by the Director of the National Appeals Division. Pl.'s Mem. in Supp. at p. 8. Review was denied because Mr. Horn's appeal was signed by counsel, and the agency's rules required Mr. Horn to personally sign the request. Id. at 8–9. When he resubmitted his appeal, it was late. His request for reconsideration was also denied. Id. After exhausting his ad-ministrative appeals, Mr. Horn filed this suit on November 18, 2002.

## III. THE STATUTORY AND REGULATORY SCHEME

The loss of wetlands is a matter of growing national concern. According to studies prepared by the United States Fish and Wildlife Service, Indiana experienced an 87% loss of wetlands between the 1780's and mid 1980's.[5] For the United States as a whole, the forty-eight conterminous states lost 53% of wetlands, with 2.5% of that loss taking place between the mid–1970's and the mid–1980's.[6] During those ten years, the United States was losing wetlands at the rate of about 290,000 acres per year.[7] At the same time, the values of wetlands to human society have become better known and documented.[8]

To help with the problem of conserving wetlands, Congress included a provision in the Food Security Act of 1985 (the "FSA"), called the "Swampbuster" provision, that

5. Dahl. T.E.1990, *Wetlands, Losses in the United States 1780's to 1980's*, U.S. Fish and Wildlife Service, Washington, .D.C., available at <*http://www.n pwrc.usgs.gov/resouce/othr-data/wetloss/wetloss.htm*. This study is the first study in response to the Congressional requirement in the Emergency Wetlands Resources Act of 1986 that the Fish and Wildlife Service conduct status and trend studies and report the results to Congress every ten years. Id.

6. Id., Dahl, T.E., and C.E. Johnson, 1991, *Wetlands: Status and Trends in the Conterminous United States Mid–1970's to Mid–1980's*, U.S. Fish and Wildlife Service, Washington, D.C. This is the second of the two studies required by Congress to monitor the rate at which wetlands are disappearing. Id.

7. The most recent study released by the Fish and Wildlife Service indicates that the rate of loss has slowed to about 58,000 acres per year, an 80% reduction in the rate of loss. Dahl, T.E., 2000, *Status and Trends of Wetlands in the Conterminous United States 1986 to 1997*, United States Fish and Wildlife Service. Washington, D.C.

8. Congress stated, in enacting the provision, that wetlands are a priceless resource whose contributions have long gone unrecognized. Some of the benefits include wildlife habitat, flood control, water quality, groundwater recharge, and recreation. H.R. Rep. 99–271(I), codified at 1985 U.S.C.C.A.N. 1103, 1188. *See also*, Noss, Reed F., et al., *Endangered Ecosystems of the United States: A Preliminary Assessment of Loss and Degradation* (stating that the great interest in wetlands by conservationists and agencies is most likely related to the widely recognized valued of wetlands to human society: habitat for waterfowl and other game, nurseries for fishes, controllers of floods, cleansers of water, and many other services), *citing*, Tiner, R.W., 1984, *Wetlands of the United States: Current Status and Recent Trends.*, U.S. Fish and Wildlife Service, Washington, D.C.

prohibits farmers who participate in USDA programs from converting wetlands and then producing an agricultural commodity on the converted wetlands. 16 U.S.C. § 3821(a) & (b). In 1990, Congress passed the Food, Agriculture, Conservation and Trade Act (FACTA), extending the prohibition such that a violation occurs when a wetland is converted for agricultural use, even if an agricultural commodity has not actually been produced. 16 U.S.C. § 3821(c). In addition, Congress added a stronger penalty for converting a wetland in the 1990 Statute. Id. Under the 1985 Statute, farming a converted wetland resulted in a proportional loss of benefits, but under the 1990 Statute, converting a wetland after November 28, 1990, would result in the loss of *all* USDA benefits on all land the farmer controls, until the wetland is restored or the loss is mitigated. 16 U.S.C. §§ 3821(c) & 3822(i).

The first thing the Court must determine is which provision of the statute Horn Farms is charged with violating, as it controls the outcome on one issue. The wetland certification notice issued to Gene Horn states that he had four tracts—field un2, un3, un4, and un5—that were classified as CW+1998. Admin. R. at p. 24. The explanatory comments state that CWyr means a wetland converted after 11/28/1990. Id. at p. 25. Other parcels examined at the same time were labeled PC/NW, which stands for Prior-converted Cropland/Non Wetland; NW, which stands for Non Wetland; and W, which stands for Wetland. Id. at p. 24. Since the four parcels found to be in violation are labeled CW+1998, they are wetlands converted after November 28, 1990, and fall under subsection (c). Subsection (a) does not apply to wetlands converted after November 28, 1990.

The specific statutory provision at issue, 16 U.S.C.A. § 3821(c), Wetland conversion, states:

Except as provided in section 3822 of this title and notwithstanding any other provision of law, any person who in any crop year beginning after November 28, 1990, converts a wetland by draining, dredging, filling, leveling, or any other means for the purpose, or to have the effect, of making the production of an agricultural commodity possible on such converted wetland shall be ineligible for those payments, loans, or programs specified in subsection (b) of this section for that crop year an all subsequent crop years.

Subsection (c) references subsection (b) in order to identify the particular payments, loans, or programs that a violator can no longer receive. This reference could create confusion, however, because the first paragraph of subsection (b) states, "If a person is determined to have committed a violation under subsection (a) of this section during the crop year, the Secretary shall determine which of, and the amount of, the following loans and payments for which the person shall be ineligible." 16 U.S.C.A. § 3821(b). Under subsection (a), the amount of loans or payments that the person is ineligible for is "to be proportionate to the severity of the violation." 16 U.S.C.A. § 3821(a)(2).

However, Horn Farms and Gene Horn were not charged with violating subsection (a), but rather subsection (c), which does not contain a proportionality requirement. A person who converts a wetland after 1990 is in violation of subsection (c), as noted above, and is ineligible for *all* payments, loans, or programs specified in subsection (b), for that crop year and *all* subsequent years.

The Statute does contain exemptions from ineligibility, however, including one for prior-converted wetlands if the original conversion of the wetland occurred prior to December 23, 1985, and the wetland char-

acteristics returned after that date as a result of "(i) the lack of maintenance of drainage, dikes, levees, or similar structures; (ii) a lack of management of the lands containing the wetland; or (iii) circumstances beyond the control of the person." 16 U.S.C. § 3822(b)(2)(D).

The Statute also contains a "good faith exemption", which states, "The Secretary *may* waive a person's ineligibility under section 3821 of this title for program loans, payments, and benefits as the result of the conversion of a wetland subsequent to November 28, 1990, or the production of an agricultural commodity on a converted wetland, if the Secretary determines that the person has acted in good faith and without intent to violate this subchapter." 16 U.S.C.A. § 3822(h)(1)(emphasis added). However, after a finding that the program participant acted in good faith and without intent to violate the Statute, the individual must, within one year, "implement the measures and practices necessary to be considered to (sic) actively restoring the subject wetland", in order to maintain eligibility. 16 U.S.C.A. § 3822(h)(2).

The Statute also contains a provision that for regaining eligibility if, prior to the beginning of the crop year, "the person has fully restored the characteristics of the converted wetland to its prior wetland state or has otherwise mitigated for the loss of wetland values, as determined by the Secretary, through the restoration, enhancement, or creation of wetland values in the same general area of the local watershed as the converted wetland." 16 U.S.C. § 3822(i).

The Statute and the Code of Federal Regulations divides responsibility for administering the "Swampbuster" provisions between two USDA agencies: the Natural Resources Conservation Service (the "NRCS"), and the Farm Service Agency (the "FSA"). The Statute requires the NRCS to make all technical determina-

tions, restoration and mitigation plans, and to conduct monitoring activities pursuant. 16 U.S.C.A. § 3822(j). The Code of Federal Regulations assigns the following determinations to the NRCS:

(1) whether the land at issue was a wetland converted for the purpose of, or having the effect of, making the production of an agricultural commodity possible;

(2) whether a farmed wetland or farmed-wetland pasture is abandoned;

(3) whether the planting of an agricultural commodity on a wetland is possible under natural conditions;

(4) whether maintenance of existing drainage exceeds the scope and effect of the original drainage;

(5) whether a plan for the mitigation of a converted wetland will be approved and whether the mitigation of a converted wetland is accomplished according to the approved mitigation plan.

7 C.F.R. § 12.6(c)(2)(viii)-(xii). The NRCS also determines whether land is a prior-converted cropland and meets the definition of a prior-converted cropland as of the date of its wetland determination. 7 C.F.R. § 12.5(b)(1)(i).

The responsibilities of the Farm Services Agency include making the following determinations:

(1) ineligibility of benefits;

(2) whether conversion of a particular wetland was commenced before December 23, 1985, for the purposes of § 12.5(b)(3);

(3) whether the violations were made in good faith.

7 C.F.R. § 12.6(a); 7 C.F.R. § 12.6(b)(3)(vi) and (viii). In addition, appeals, including appeals of NRCS technical determinations, must be filed with the FSA County Committee. 7 C.F.R. § 12.6(c)(9); 7 C.F.R. § 12.12; 7 C.F.R.

§ 614.101(a)(2); and 7 C.F.R § 780.9. If the decision of the FSA County Committee is unfavorable, program participants *must* seek review before a Hearing Officer of the National Appeals Division, and *may* appeal to the Director of the NAD, before seeking judicial review. 7 C.F.R. § 11.2(b)(emphasis added).

## IV. STANDARD OF REVIEW

Both parties in this action have moved for summary judgment pursuant to Fed. R.Civ.P. 56. The standards a court employs in reviewing a motion for summary judgment are well-established. Summary judgment is proper only if the record shows that there is no issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *King v. Preferred Technical Group*, 166 F.3d 887, 890 (7th Cir.1999)(citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

■■■ Where cross-motions for summary judgment are involved, the court looks to the burden of proof that each party would bear on the issue at trial, requiring that party to go beyond the pleadings and affirmatively establish a genuine issue of material fact. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir.1997). The court is not required to grant judgment as a matter of law for one side or the other. *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993); *Judsen Rubber Works, Inc. v. Manufacturing, Prod. & Serv. Workers Union Local No. 24*, 889 F.Supp. 1057, 1060 (N.D.Ill.1995). Rather, the court must evaluate each party's motion on its own merits, resolving factual uncertainties and drawing all reasonable inferences

against the party whose motion is under consideration. *Heublein*, 996 F.2d at 1461; *Judsen*, 889 F.Supp. at 1060; *Buttitta v. City of Chicago*, 803 F.Supp. 213, 217 (N.D.Ill.1992), *aff'd*, 9 F.3d 1198 (7th Cir. 1993). In other words, the court must extend to each party the benefit of any factual doubt when considering the other's motion, a process that sometimes forces the denial of both motions. *Id.*

## V. ANALYSIS

The Administrative Procedures Act provides multiple theories for individuals to challenge the actions of Federal agencies in Federal court. 5 U.S.C. § 706. The Court is instructed to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." Id. The Court is authorized to

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)contrary to constitutional right, power, privilege, or immunity; or

(C) in excess of statutory jurisdiction, authority, or limitations or short of statutory right;

5 U.S.C. § 706(A)-(C).

The Plaintiff has asked this Court for injunctive and declaratory relief based on several theories under the APA. First, it claims that the Defendants actions violated the Due Process Clause found in the Fifth Amendment of the United States Constitution because they failed to provide a meaningful opportunity to be heard prior to terminating its benefits under the Farm

Bill. Pl.'s Mem. in Supp. at 10. The Plaintiff also alleges that the statute at issue is a violation of the Spending Power of the United States Constitution because it amounts to impermissible coercion. Id. Finally, the Plaintiff challenges various decisions made by the USDA as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Id.

The Defendants also filed a Motion to Dismiss in this case. In addition to addressing the three claims listed above, the Defendants addressed another issue in the Plaintiff's Complaint based on 5 U.S.C. § 558, requiring fair notice and a hearing before terminating a license. The Court will address these issues in the following order: first, whether the Plaintiff was afforded due process before the termination of his eligibility in various farm subsidy programs; second, whether the Swampbuster provisions exceed Congress's authority under the spending clause; third, whether the agencies' decisions were arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law; and finally, whether the provisions in 5 U.S.C. § 558 apply to this case.

### A. Procedural Due Process Analysis

The basis of the Plaintiff's Due Process claim is its inability to get a review of the district conservationist's determinations that the areas at issue were converted wetlands, and that they did not qualify for an exemption as prior-converted wetlands. For a Due Process violation, the Plaintiff must establish that the government has deprived it of a protected interest in liberty or property, and that it was deprived of that interest without adequate process of law. See, American Manufacturers Mutual Insurance Company v. Sullivan, 526 U.S. 40, 59, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999).

The Defendants in this case concede that the Plaintiff's eligibility to participate in various farm subsidy programs is a protected interest under the Fifth Amendment. Def.'s' Mem. in Supp. at p. 19. The Defendants assert, however, that the process afforded to the Plaintiff under the current regulatory system affords all the process that is constitutionally required. Id. In 1970, the Supreme Court of the United States held that the fundamental requisite of due process of law is an opportunity to be heard "at a meaningful time and in a meaningful manner." Goldberg v. Kelly, 397 U.S. 254, 267, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). In Goldberg, a case that has not been limited to its own facts,[9] the Court stated, "these principles require that a recipient have timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." Id. at 267–68, 90 S.Ct. 1011.

▮ To assist in evaluating Procedural Due Process claims, the Supreme Court set forth a three-part balancing test in Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); a test that is still in use in this Circuit, see, Doyle v. Camelot Care Centers, Inc. 305 F.3d 603 (7th Cir.2002). This test requires consideration of (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and

9. See, i.e., Atkins v. Parker, 472 U.S. 115, 128, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985)(finding a protectable interest in food stamp benefits); Goss v. Lopez, 419 U.S. 565, 575–76, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)(same, for the right to education at public school); Mathews v. Eldridge, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)(same, for disability benefits); Youakim v. McDonald, 71 F.3d 1274, 1288–89 (7th Cir.1995)(same, for foster care benefits); and others.

the probably value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.*

■ A survey of the caselaw applying the Swampbuster provisions in effect prior to 1996 reveals that program participants in danger of losing their eligibility in USDA farm programs had several levels of appeal on critical wetlands determinations. In 1995, the National Appeals Division Rules of Procedure changed, effective January 16, 1996. Under the new rules, program participants like Horn Farms cannot get any review of the district conservationist's technical determinations unless the FSA County Committee *agrees with* their

appeal.[10] The question before the Court is whether the new regulations provide program participants with an opportunity to be heard at a meaningful time and in a meaningful manner, as required by the Due Process Clause of the Constitution of the United States. The Court could find no cases discussing the new regulations as a possible violation of the Due Process Clause.

However, several cases discuss the review that was afforded under the old regulations, which the Court will include in some detail for the purpose of comparison. For example, in *Dierckman,* from the Seventh Circuit Court of Appeals, the farmer appealed from an unfavorable determination by the district conservationist, first to the area conservationist, then to the state conservationist. *United States v. Dierckman,* 201 F.3d 915, 920 (7th Cir.2000).

10. The rules on appeals contain numerous cross-references on the issue of appealing the district conservationists' technical determinations, creating a regulatory maze that is difficult to follow. First, 7 C.F.R. § 12.6(c)(9) states,

> Persons who are adversely affected by a determination made under this section and believe that the requirements of this part were improperly applied may appeal, under § 12.12 of this part, any determination by NRCS.

Then, 7 C.F.R. § 12.12, states

> Any person who has been or who would be denied program benefits in accordances with § 12.4 as the result of any determination made in accordance with the provisions of this part may obtain a review of such determination in accordance with the administrative appeals procedures of the agency which rendered such determination. Agency appeal procedures are contained in the Code of Federal Regulations as follows: FSA, part 780 of this title; NRCS, part 614 of this title.

Since Horn Farms wishes to appeal a technical determination of the NRCS, the applicable regulation is 7 C.F.R. § 614.101(a)(2), which states,

> Once the technical determination is final, the landowner or program participant may appeal the technical determination to the

FSA county or area committee pursuant to 7 CFR. part 780. Landowners or program participants wishing to appeal must exhaust any available appeal procedures through the FSA county committee prior to appealing to NAD. Judicial review is available only as specified in 7 CFR part 11.

Again, since Horn Farms is seeking judicial review, the next regulation in the maze is 7 C.F.R § 780.9, on appeals of NRCS technical determinations, which states,

> (a) Notwithstanding any other provision of this part, a technical determination of NRCS issued to a participant pursuant to Title XII of the Food Security Act of 1985, as amended, including wetland determinations, may be appealed to a county committee in accordance with the procedures in this part.
> (b) If the county committee hears the appeal *and agrees with* the participant's appeal, the county committee shall refer the case with its findings to the NRCS State Conservationist to review the matter and review the technical determination. The court or State committee decisions shall incorporate, and be based upon, the NRCS State Conservationist's technical determination. (emphasis added).

Before affirming the determination of the area conservationist, members of the state conservationist's wetland appellate review team visited the farm and performed field tests. *Id.* He later appealed the wetland and conversion determinations to the state conservationist. *Id.* at 921.

Similarly, in a case from the Eight Circuit Court of Appeals, after the District Conservationist made his initial, unfavorable determination, the plaintiff appealed to the Area Conservationist. *Downer v. U.S. By and Through U.S. Dept. of Agriculture*, 894 F.Supp. 1348 (D.S.D.1995); affirmed, 97 F.3d 999 (8th Cir.1996). A resource conservationist, an area engineer, a soil conservationist, and a soil specialist from the University of Minnesota conducted an on-site inspection, with the plaintiff and his attorney present. When he again received an unfavorable determination, the plaintiff appealed to the State Conservationist, and another on-site inspection was conducted, this time by a soil conservation engineer, a South Dakota Area III soil scientist, and a South Dakota biologist. Then, the plaintiff appealed to the Chief of the SCS, who returned it to the state level to supplement the record. An informal hearing was held, and the State Conservationist again determined that the areas in question were converted wetlands. The case then went to the Chief, SCS, where the supplemented administrative record was reviewed by a wildlife biologist, a drainage engineer and a soil scientist, who all agreed with the determination that the areas were converted wetlands. *Id.* After exhausting his appeals through the SCS, the plaintiff then appealed to the ASCS for reconsideration of the SCS determination, where it went through three levels of appeal. *Id.*

In this case, Albert Tinsley performed an on-site inspection in the presence of Gene Horn, the owner of Horn Farms. He made some field notes, and looked at "slides" of the area from 1981 to 1985. He noted that the field appeared to have been drained at some point in time, but that they system stopped functioning and trees returned at some time, no later than in the 1970's, and "were not suitable for a determination of PC during the pertinent 1981–1985 time frame for purposes of the Farm Bill provisions or the 1993–1998 time frame for purposes of the Clean Water Act." Admin. R. at p. 75. The letter informing the Plaintiff that he had violated the Swampbuster provisions by converting wetlands which was dated May 5, 1999, was signed "Daniel M. Rosswurm, Resource Conservationist". Id. at p. 72. The letter states, "I am making a preliminary technical determination" that the fields contain converted wetlands. Id. It appears from this language that Rosswurm actually made the technical determinations that the Plaintiff challenges, based on the field visit made by Tinsley.

Under the new regulations, the Plaintiff's only option was to appeal the NRCS technical determinations to the FSA County Committee, even though the County Committee did not have authority to review the technical determinations. The role of the FSA County Committee is simply to decide if it agrees with the Plaintiff's appeal, and if not, to make the eligibility decisions. In other words, in order to get review of the district conservationist's determinations that he converted 6.2 acres of wetlands, and that the exemption for prior-converted cropland did not apply, the Plaintiff had to convince the County Committee to *agree with* its appeal. If the County Committee does not agree with the appeal, the appeal is over, the Plaintiff cannot get review of the NRCS technical determinations that terminated its eligibility.

This is a high standard to require participants to meet, one that has the practical effect of eliminating most, if not all, review of the district conservationist's technical

determinations. For example, in this case, the FSA County Committee determination was issued only one day after the hearing and simply stated that "merit could not be found in regards to making a recommendation the NRCS technical determination be reviewed by the Indiana NRCS State Conservationist." In other words, after considering the matter for one day, the County Committee issued a one line ruling that turned out to be unreviewable by the NAD, according to NAD hearing officer, Michael Jacobs.

Furthermore, the County Committee did not rule on the good faith issue, even though Congress assigned responsibility for that decision to the FSA. The good faith exemption allows the Agency to waive a person's ineligibility upon a finding that the person acted in good faith and without intent to violate the Swampbuster provisions. The person is then given one year to restore the wetland, without losing any benefits available under the Food Security Act. However, by the time the County Committee was presented with the Plaintiff's request for a good faith exemption, it was too late to provide the Plaintiff with any relief. Horn Farms lost its eligibility in 1999 and payments were terminated, but the hearing before the County Committee did not take place until 2001. Although this provision is discretionary with the Agency—the statute says the Secretary *may* waive ineligibility—there is no evidence in the record that the Agency even considered Horn Farms application for the good faith exemption.

The Defendants assert, however, that Plaintiff's Due Process grievance is based on the fact that it was not provided with an adversarial type hearing. The Defendants are correct in pointing out that the Plaintiff was not entitled to an adversarial type hearing, but the Plaintiff's objections are not to the type of hearing, but to the limitations on its opportunity to get any review of the district conservationist's technical determinations.

By inserting a new level of bureaucracy in the process—the requirement that the FSA County Committee *agree with* Plaintiff's appeal—between the technical determination and any review of that determination, the Plaintiff was effectively denied any opportunity to be heard at a meaningful time and in a meaningful way on the issues at the heart of their appeal: the wetlands determination, and the denial of prior-converted farmland status. The Plaintiff was given a mediation hearing, but that was only for the purpose of determining how to get Horn Farms back into compliance with the statute. The unfavorable technical determination was not even on the agenda.

While the former process was lengthy and in all likelihood expensive, it protected the Due Process rights of farmers who participated in programs under the Farm Bills. The new regulatory process requiring that the FSA County Committee *agree with* the participant's appeal places an almost insurmountable obstacle in the way of participants seeking review of an unfavorable opinion by the district conservationist. The Court will therefore apply the *Mathews* balancing test to determine whether the new regulations violate Plaintiff's Due Process rights.

First, the Court finds that the participant's interest in remaining in federal farm programs is great. The economic climate is such that eligibility in Farm Bill programs can make or break a farmer.[11] On the second factor, the risk of erroneous

---

11. See the Plaintiff's arguments on the issue of impermissible coercion under the Spending Clause, Pl.'s Reply Mem. at 4–7. As of the end of 2003, the USDA had withheld approxi-mately $154,961.36 in payments that Horn Farms would have received but for the determination that it violated the Swampbuster provisions. Pl.'s Ex. E.

deprivation of the interest through the procedures used is fairly high, since the determination appears to be based on the opinion of just one district conservationist. Also, on the second factor, having additional review by experts would reduce the risk of an error. Finally, the burden of the additional procedures on the government is also fairly high, as illustrated by the lengthy review process in the two cases discussed above that were decided under the old regulations.

Although it is close, the importance to America's farmers of maintaining eligibility in farm programs administered by the USDA weighs heavily in favor of requiring additional process within the NRCS before issuing the final technical determination that terminates a farmer's eligibility to participate in all programs under the Food Security Act. Therefore, the Court concludes that the new regulatory scheme for appealing unfavorable technical determinations by the NRCS violates the Plaintiff's Due Process right to an opportunity to be heard at a meaningful time and in a meaningful manner. This does not mean that the entire process from the previous regulations must be reinstated, but simply that the Plaintiff is entitled to review of the NRCS technical determinations by someone at a higher level within the NRCS.

### B. Spending Clause Analysis

■ The Plaintiff seeks to have the Swampbuster provisions invalidated as an improper exercise of Congressional authority under the Spending Clause, because they are impermissibly coercive. The Defendants argue that the Seventh Circuit considered this issue in *Dierckman*, and determined that the Statute was a valid exercise of Congressional authority

under the Spending Clause. *See, Dierckman*, 201 F.3d at 922. *Dierckman* is directly on point. The Seventh Circuit stated, "Even though Congress may lack the authority to regulate directly a strictly intrastate wetland, the incentive provided by the Food Security Act is a valid exercise of the spending power." *Id.*

The Plaintiff argues that, nevertheless, the standard to determine impermissible government coercion for an individual citizen must be more relaxed, because most cases analyzing conditional federal spending arguably interfere with a state's autonomy. But that is precisely the reason that coercion is even being discussed in those cases, because the Constitution limits the power of Congress to force the states to carry out Congressional policy. *See, South Dakota v. Dole*, 483 U.S. 203, 206, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). The Plaintiff has not explained how coercing farmers to protect wetland or risk losing their federal farm program benefits violates the Constitution.

■ The Court agrees that the Swampbuster provisions are coercive, in fact, they give the USDA a big club with which to protect wetlands. However, Congressional authority under the Spending Clause is only limited by other provisions in the Constitution, and establishing that Congress has placed "unconstitutional conditions" on the receipt of federal funding is an uphill battle. *See, South Dakota v. Dole*, 483 U.S. 203, 206, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987)(holding that the conditions were valid), *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)(same), and *United States v. American Library Ass'n*, 539 U.S. 194, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003)(same).[12] *See*

---

**12.** Examples in which non-state plaintiffs have alleged unconstitutional conditions in Congressional appropriation requirements are *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), and *United*

*States v. American Library Ass'n*, 539 U.S. 194, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003). In *Rust*, the plaintiffs claimed that the government's refusal to fund abortion counseling

*also,* Pl.'s Reply at 5, citing *United Seniors Association, Inc. v. Shalala,* 2 F.Supp.2d 39, 42 (D.D.C.1998).

One of the modern realities is that conditioning of Congressional appropriations has become vastly important in the enunciation and enforcement of public policy on the States, and in this case, on American farmers.[13] It is a phenomenon that the writers and founders of the Constitution probably did not contemplate. But the reality is that Congress can condition appropriation in very important ways that permit the creation of public policy indirectly which sometimes could not be done directly. This may be such a case. It is likely that the limitations on the authority of Congress in the Commerce Clause, as interpreted by the Supreme Court of the United States in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers,* 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001), would inhibit this particular regulation if done directly rather than as a condition found in an appropriation bill. As it is, Defendants' Motion for Summary Judgment on this issue must be **GRANTED.**

## C. Arbitrary and Capricious Review

The Plaintiff also claim that two of the Defendants' decisions in this case were

violated their free speech rights. Plaintiffs also claimed that the requirement violated a woman's right to have an abortion. *Id.* The Supreme Court upheld the requirement as a valid under the Spending Clause. *Id.* In *American Library Ass'n,* plaintiffs challenged provisions in the Children's Internet Protection Act, which required public libraries to use Internet filters as a condition for receipt of federal subsidies, claiming that the statute placed unconstitutional conditions on public libraries and violated their free speech rights. Again, the Supreme Court found it to be a valid exercise of Congressional power under the Spending Clause.

**13.** The Plaintiff supports its argument with a citation to the 1936 Supreme Court decision

arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of 5 U.S.C. § 706(A). The court must ask "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Highway J Citizens Group v. Mineta* 349 F.3d 938 (7th Cir.2003), citing *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (internal quotations and citations omitted).

■■■ This is a highly deferential standard, but does not equate with no review at all. *See, Bagdonas v. Department of Treasury,* 93 F.3d 422, 425 (7th Cir.1996). "The inquiry must be thorough and probing." *Id.* at 426. The court must uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned, but the court may not supply a reasoned basis for the agency's action that the agency itself has not given. *Id.* (citations omitted). The agency is not required to include detailed findings of fact, but must inform the court and the petitioner of the grounds of the decision and the essential facts upon which the decision was made. *Dierckman,* 201 F.3d 915, 926 (7th Cir.2000) (citations omitted).

in *United States v. Butler* 297 U.S. 1, 71, 56 S.Ct. 312, 80 L.Ed. 477(1936), which states that the power to confer or withhold unlimited benefits is the power to coerce or destroy. The Court in *Butler* struck down a funding condition similar to the one at issue in this case. *Butler,* 297 U.S. at 71, 56 S.Ct. 312. However, the reasoning in *Butler* has not been followed in any subsequent Supreme Court case, and "Federal courts of appeal have been similarly reluctant to invalidate funding conditions." *Kansas v. United States,* 214 F.3d 1196 (10th Cir.2000). "The coercion theory has been much discussed but infrequently in federal case law, and never in favor of the challenging party." *Nevada v. Skinner,* 884 F.2d 445, 448 (9th Cir.1989).

■ "To perform this review the court looks to whether the agency considered those factors Congress intended it to consider; whether the agency considered factors Congress did not intend it to consider; whether the agency failed entirely to consider an important aspect of the problem; whether the agency decision runs counter to the evidence before it; or whether there is such a lack of a rational connection between the facts found and the decision made that the disputed decision cannot 'be ascribed to a difference in view or the product of agency expertise.'" *Downer v. U.S. By and Through U.S. Dept. of Agriculture and Soil Conservation Service,* 97 F.3d 999, 1002 (8th Cir.1996), *quoting, Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

### 1. The Challenged Agency Decisions

The two decisions that Plaintiff wants reviewed under this standard are the USDA's determination that the it unlawfully converted wetlands, by failing to recognize that the land at issue was a prior-converted wetland, and the USDA's failure to conduct the required proportionality analysis. Pl.'s Response at 6–7. The Court has already considered the proportionality requirement and determined that the statutory provision that Plaintiff is accused of violating does not require a proportionality analysis. Therefore, Defendants' Motion for Summary Judgment on the proportionality issue is **GRANTED.**

### 2. The Prior-converted Wetland Issue

■ Resolving the prior-converted wetland issue requires a detailed analysis of the statute and implementing regulations. The specific statutory language on prior-converted wetlands states:

(b) Exemptions

No person shall become ineligible under section 3821 of this title for program loans or payments under the following circumstances:

(2) For the conversion of the following:

(D) A wetland previously identified as a converted wetland (if the original conversion of the wetland was commenced before December 23, 1985), but that the Secretary determines returned to wetland status after that date as a result of—

(i) the lack of maintenance of drainage, dikes, levees, or similar structures;

(ii) a lack of management of the lands containing the wetland; or

(iii) circumstances beyond the control of the person.

16 U.S.C. § 3822(b)(2)(D).

The Government and Plaintiff agree that at some time the area at issue had a drainage system and was farmed. *See,* Admin. R. at p. 75. Tinsley's Field Trip Notes state,

The chronology of this field appears to be that it was drained many decades ago, the system stopped functioning, trees had returned sometime no later than in the 1970's and were not suitable for a determination of PC during the pertinent 1981–1985 time frame for purposes of the Farm Bill provisions or the 1993–1998 time frame for purposes of the Clean Water Act.

Id.

The issue is whether the Plaintiff's 6.2 acres of converted wetland qualifies for the exemption as prior-converted wetland. The briefs by the parties indicate an ambiguity in section (D) of the statute, in the phrase "A wetland previously identified as a converted wetland (if the original conversion of the wetland was commenced before December 23, 1985), but that the Secretary determines returned to wetland status *after that date* as a result of ..." (emphasis added). Plaintiff claims that "after that

date" means after the date that the wetland was originally converted. Defendants construe the "after that date" language as a reference to the effective date of the statute, December 23, 1985.

According to the Plaintiff's interpretation, the 6.2 acres are wetlands that were converted prior to 1985, they returned to wetland status at some time after the original conversion, as a result of lack of maintenance of the drainage system, therefore, the land qualifies. According to the Defendant's interpretation, the Plaintiff's 6.2 acres contained functioning drainage tiles at one point in time, but wetland conditions had already returned by December 23, 1985. Therefore, the Defendants assert that this exemption does not apply because the wetland status returned after the effective date of December 23, 1985.

The USDA has interpreted this provision of the statute in 7 C.F.R. § 12.5(b)(1)(i), which states that the exemption applies if the land is "a prior-converted cropland and meets the definition of a prior-converted cropland as of the date of a wetland determination by NRCS." The Regulations define prior-converted cropland in 7 C.F.R. § 12.2(8), which states,

> Prior-converted cropland is a converted wetland where the conversion occurred prior to December 23, 1985, an agricultural commodity had been produced at least once before December 23, 1985, and as of December 23, 1985, the converted wetland did not support woody vegetation and met the following hydrologic criteria:
> (i) Inundation was less than 15 consecutive days during the growing season or 10 percent of the growing season, whichever is less ...

In his field visit notes, the district conservationist observed that the areas where he saw broken drain tiles had been in mature trees prior to 1981, and that the system had stopped functioning and trees had returned sometime no later than in the 1970's. Therefore, he concluded that it was not suitable for a determination of PC (prior-converted wetland). The field notes do not explain why the presence of mature trees makes the area unsuitable for a determination of prior-converted wetland. It is possible that Tinsley had in mind the definition of prior-converted cropland in 7 C.F.R. § 12.2(8), that as of December 23, 1985, the converted wetland did not support woody vegetation, but the field notes do not explain the connection between the presence of trees and the denial of "prior-converted cropland" status for these areas.

The Court must first determine if the USDA's interpretation of the statute is "reasonable", before getting to the issue of whether the Agency's decisions in this case were arbitrary and capricious. The analysis for USDA regulations under the Swampbuster provisions follows the framework established by the Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Dierckman*, 201 F.3d at 923. The starting point of the analysis is the statutory language, and if "the plain meaning of the text of the statute either supports or opposes the regulation," the inquiry ends, and the court must apply the statute's plain meaning. *Id.* at 923, quoting *Solid Waste Agency v. U.S. Army Corps of Engineers*, 191 F.3d 845, 851 (7th Cir.1999). If the statute is silent or ambiguous, "the court must defer to the agency interpretation so long as it is based on a reasonable reading of the statute." *Id., see also, Hanson v. Espy*, 8 F.3d 469, 472–73 (7th Cir.1993).

As noted above, the statutory language is ambiguous. The Agency's interpretation is reasonable, and that would ordinarily end the analysis. However, the Plaintiff has cited to the Congressional Record,

claiming that the discussion surrounding enactment of the Swampbuster Amendment indicates that it was the intent of Congress to grandfather land that was in production at any time in the past. Pl.'s Mem. in Supp. at 40, n. 23, *citing*, H.R. REP. 99–271, pt. 1, at 419, 99th Cong. (1st Sess.1985), *reprinted in* 1985 U.S.C.C.A.N. 1103, 1523. The discussion was between then Representative Tom Daschle, the sponsor of the Swampbuster Amendment, and other Representatives. Because it reflects the views of Congress on the Amendment, the entire discussion is set forth below.

> Mr. Daschle was recognized to offer a clarifying amendment to the previously adopted Swampbuster provisions. Mr. Daschle briefly explained the provisions of the Amendment. Mr. Lewis offered an Amendment to the Amendment to clarify that the definition of wetlands would not include simply wet soils. Mr. Daschle said he would accept the Amendment. The Committee agreed to the Lewis Amendment by voice vote. Mr. Daschle and Mr. Lewis discussed the question of cropland that has been flooded and later reclaimed. Mr. Daschle stressed that the Amendment would not affect the use of this land because if production was underway at any time in the past, the land would be grandfathered.

Id. The Amendment passed in the form of the legislation now before this Court for interpretation. The 6.2 acres at issue in this case were at one time drained and farmed. According to the author of the Swampbuster provisions, cropland like the Plaintiff's, land that was farmed, then flooded and later reclaimed, would be grandfathered if it was in production at any time in the past. Even though the language of the statute is ambiguous, it appears that Congress considered this issue, and the record supports the Plaintiff's position.

The Court is mindful that the Swampbuster provisions were strengthened in 1990, and altered again in 1996, and those changes must be considered to determine if Congress spoke directly on the issue. The Plaintiff points out that a change in 1996 on abandonment favors their interpretation of the statute. Pl.'s Mem. in Supp. at 40.[14] Under the old regulations, prior-converted cropland that was not farmed for five years was deemed "abandoned" and lost its exempt status. Id. In order to retain exempt status, the farmer had to plow up the land every five years. Id. According to Warren Lee, the Director of the Watersheds and Wetlands Division of the NRCS,

> [I]f a landowner with a PC [prior-converted cropland] wishes to provide wetland functions and values to society by letting his land labeled PC revert back to a wetland, we should not make him plow it up every five years just so he can keep his designation. Even if he wishes to then turn it into a corn field fifteen years later, society received those benefits of the wetland for that time, and it doesn't seem right to penalize the producer by saying he just converted a wetland. That is not the intent of Swampbuster or abandonment.[15]

Based on the Agency's interpretation of the statute, if the Plaintiff's land was

---

**14.** The NRCS summarized changes to the Swampbuster provisions in a factsheet available on their website at *<http://www.nrcs.usda.gov/programs/wetlands/ChngFact.html>*

**15.** McBeth, Daryn, *Wetlands Conservation and Federal Regulation: Analysis of the Food Security Act's "Swampbuster" Provisions as Amended by the Federal Agriculture Improvement and Reform Act of 1996*, 21 Harv. Envtl. L.Rev. 201, 256 (1997).

farmed in 1985, then allowed to return to a wetland, he could clear it and farm it without violating the statute. But, because farming ceased on these areas a few years earlier, in the late 1970's, and trees were growing on some of the tracts in 1985, the Plaintiff violated the Swampbuster provisions. Based on the Agency's interpretation of the statute, the 6.2 acres cleared were "not suitable for a PC determination" because they were not farmed in 1985 or the five years prior to 1985.

In light of Mr. Daschle's statements in the Congressional record, and the statutory change doing away with the concept of abandonment, the Court finds that the Agency's requirement that land be farmed in 1985 to qualify as prior-converted cropland is not a reasonable interpretation of the statute. In this case, society has had the benefit of wetlands on Plaintiff's 6.2 acres for more than twenty years, and, in the words of Warren Lee, "it doesn't seem right to penalize [Horn Farms] by saying [it] just converted a wetland."

This Court has here attempted to wade through a highly complicated and often convoluted series of federal regulations and procedures that often stretched and in this case, exceeded Congressional authority under the statute. The Court has literally plowing through this complex and complicated record, and finds that the issue comes down to the intent of Congress, another highly complicated concept, with complications upon complications. After minute consideration of the record and the regulations at issue in this case, the Court has come down on the side of effectuating the intent of Congress as expressed by a key sponsor of the legislation in that regard. Once that decision is made, the result here is easier to determine. After Congress changed the statute in 1996, overruling the Agency's regulations on abandonment, it is a small step for this Court to find that the Agency's definition of "prior-converted cropland", requiring that the land be in production in 1985 to qualify, exceeds the Agency's statutory authority and must also be overruled.

### D. Applicability of 5 U.S.C. § 558

 The Plaintiff's Complaint also asserts a claim under 5 U.S.C. § 558(c), for failure to give notice and an opportunity to demonstrate or achieve compliance before termination of its "license" to participate in the farm programs. The Defendants argue that this provision does not apply, claiming that it only applies to a license that is "required by law", and that participation in USDA farm programs is not required by law in order for the Plaintiff to farm. The Plaintiff counters that the "required by law" provision only applies to applications for licenses, it is not repeated in the second sentence addressing termination of licenses.

5 U.S.C. § 558(c) states:

(c) When application is made for a license *required by law*, the agency … shall set and complete proceedings required to be conducted in accordance with sections 556 or 557 of this title or other proceeding required by law and shall make its decision. Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given—

(1) notice by the agency in writing of the facts or conduct which may warrant the action; and

(2) opportunity to demonstrate or achieve compliance with all lawful requirements.

5 U.S.C. § 558(c)(Emphasis added).

For this provision to apply, a license must be involved. A license is defined as

"the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." 5 U.S.C. § 551(8). This definition is "extremely broad", as noted by the Ninth Circuit Court of Appeals in *Air North America v. Dept. of Transportation*, 937 F.2d 1427, 1437 (9th Cir.1991). At issue in *Air North America* was a certificate issued by the Department required for an airline to fly. The Court determined that the certificate, although not in itself sufficient to allow the airline to fly, nevertheless fit within the broad statutory language.

In other cases, courts have determined that the language was broad enough to cover a permit to graze on national forest land, *Anchustegui v. Dept. of Agriculture*, 257 F.3d 1124 (9th Cir.2001); to "specifically approved stockyard" status under the Cattle Contagious Diseases Act, *Moore v. Madigan*, 789 F.Supp. 1479 (W.D.Mo. 1992), *affirmed*, 990 F.2d 375, *rehearing denied, cert. denied*, 510 U.S. 823, 114 S.Ct. 83, 126 L.Ed.2d 51; to veterinarian accreditation, *Charlene Hagus, D.V.M. v. Michael Espy, Secretary, USDA*, 53 Agric. Dec. 443, 1994 WL 733120 (U.S.D.A.); to designation by the Immigration and Naturalization Service of a facility as an approved laboratory for conducting medical examination, *New York Pathological & X–Ray Laboratories, Inc. v. Immigration and Naturalization Service*, 523 F.2d 79 (2d Cir.1975); and to approval granted to an institution of higher learning authorizing entry of nonimmigrant alien students for study, *Blackwell College of Business v. Attorney General*, 454 F.2d 928 (D.C.Cir. 1971); among others.

In this case, the USDA's approval or permission is required for farmers to participate in various farm programs under the Food Security Act of 1985 and subsequent Farm Bills. Therefore, based on the broad definition of license to include agency "approval" or "other form of permission" the Court concludes that Plaintiff's eligibility to participate constitutes a "license" for purposes of section 558(c).

However, as already noted, the Defendants have a second argument, that even if the Plaintiff can establish that it has a "license" to participate in farm programs, that license is not "required by law." Def.'s Mem. in Supp. at p. 17. The Defendant asserts that the determinative issue is not "whether farmers who apply for certain USDA subsidy programs had to comply with the requirements of the Swampbuster provisions in order to receive those subsidies, but rather whether farmers are required by law to participate in USDA farm programs in order to farm." Id. The Court is not convinced.

The license at issue is the USDA's approval or permission to participate in various farm subsidy programs. In other words, the "license" is "required by law" in order to participate in the programs, just as a grazing permit is required to graze cattle in a national forest, or approval is required for an institute of higher learning to accept nonimmigrant alien students. *See, Anchustegui* 257 F.3d 1124; and *Blackwell College of Business*, 454 F.2d 928. The Government is correct that in some cases, the license requirement is broad, and failure to obtain a license forecloses all opportunity to work in a certain field, as with the requirement that veterinarians be accredited, *Charlene Hagus, D.V.M.*, 53 Agric. Dec. 443, 1994 WL 733120, or the requirement that airlines have the certificate in order to fly, *Air North America*, 937 F.2d at 1437, but that is not always the case.

The Court concludes that the "license" at issue in this case is required by law for farmers to participate in various programs under the Farm Bill, triggering the provisions in section 558(c) of the APA. This

provision does not create a right to a full adjudicatory hearing, but at a minimum requires that before termination of Plaintiff's "license", Defendants had to provide notice and an opportunity to demonstrate or achieve compliance with lawful requirements. *Gallagher & Ascher Co. v. Simon,* 687 F.2d 1067 (7th Cir.1982)(noting that the sole purpose of section 558(c) is to provide licensee threatened with termination of license an opportunity to correct its transgressions before actual suspension or revocation). The Plaintiff was given notice, but no opportunity to achieve compliance before termination of its eligibility. Therefore, summary judgment for the Plaintiff is appropriate on this issue.

The Court notes that this provision of the APA provides protection that is similar to, but greater than, the "good faith exemption" in the statute. Under the "good faith exemption", the Secretary has discretion to waive ineligibility and allow the person to implement measures to restore the wetland. 16 U.S.C.A. § 3822(h)(1) & (2). Under section 558(c), the agency must allow a reasonable opportunity for the licensee to demonstrate or achieve compliance before terminating the license. The record in this case does not indicate that the Defendants ever made a "good faith" determination. The Defendants could easily satisfy this provision of the APA by making the "good faith" determination early enough in the process to allow the Plaintiff to restore the wetland or mitigate the loss *before* terminating all benefits under the Act.

## VI. CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment is granted in part and denied in part. Defendants' Motion is **GRANTED** on Claim II, based on the Spending Clause, and **GRANTED** on the claim that the USDA was arbitrary and capricious for not reducing its payments in proportion to the se-

verity of the violation. The Plaintiff's Motion is also granted in part and denied in part. The Motion is **GRANTED** on the issue that the USDA's decision denying the land at issue "prior converted cropland" status was arbitrary and capricious, **GRANTED** on the Due Process claim that the Agency failed to provide meaningful review of the NRCS technical decision, and **GRANTED** on the issue of compliance with the requirements of 5 U.S.C. § 558(c). This case is now remanded to the Agency for further action not inconsistent with this opinion.

**IT IS SO ORDERED.**